[No. S126715. July 27, 2006.]

PEGGY J. SOUKUP, Plaintiff and Respondent, v.
LAW OFFICES OF HERBERT HAFIF et al., Defendants and Appellants;

[No. S126864. July 27, 2006.]

PEGGY J. SOUKUP, Plaintiff and Respondent, v.
RONALD C. STOCK, Defendant and Appellant.

**Counsel**

Ronald C. Stock, in pro. per., for Defendant and Appellant.

Law Offices of Herbert Hafif, Greg K. Hafif, Jeanne A. Sterba; Law Offices of James J. Moneer, James J. Moneer; Aitken Aitken & Cohn, Darren O. Aitken and Wylie A. Aitken for Defendants and Appellants Law Offices of Herbert Hafif et al.

Peggy J. Soukup, in pro. per.; Law Offices of Gary L. Tysch, Gary L. Tysch; Dell'Ario & LeBouef and Alan Charles Dell'Ario for Plaintiff and Respondent.

OPINION

**MORENO, J.**—In this case, we determine whether a litigant whose action was dismissed under the anti-SLAPP statute (Code Civ. Proc., § 425.16) may, in turn, invoke that statute as a defense to a subsequent action for malicious prosecution and abuse of process.[1] Peggy J. Soukup was sued by her former employers. She obtained dismissal of their action under the anti-SLAPP statute and then sued them for malicious prosecution and abuse of process. Her former employers moved to strike Soukup's action as a SLAPP. The superior court denied the motion on the ground that the anti-SLAPP statute did not apply under these circumstances. The Court of Appeal reversed and we granted review.

While this case was pending, the Legislature amended the anti-SLAPP statute to add section 425.18, which defines "any cause of action for malicious prosecution or abuse of process arising from the filing or maintenance of a prior cause of action that has been dismissed pursuant to a special motion to strike under Section 425.16" as a "SLAPPback." (§ 425.18, subd. (b)(1).) The Legislature declared that SLAPPbacks "should be treated differently . . . from an ordinary malicious prosecution action because a SLAPPback is consistent with the Legislature's intent to protect the valid exercise of the constitutional rights of free speech and petition by its deterrent effect on SLAPP . . . litigation and by its restoration of public confidence in participatory democracy." (§ 425.18, subd. (a).) Section 425.18 exempts SLAPPbacks from certain procedures otherwise applicable to motions to strike under the anti-SLAPP statute and sets forth special procedures that apply only to SLAPPbacks. Additionally, subdivision (h) of the new section precludes the use of the anti-SLAPP statute to dismiss SLAPPbacks "by a party whose filing or maintenance of the prior cause of action from which the SLAPPback arises was illegal as a matter of law." (§ 425.18, subd. (h).)

As we explain, section 425.18 applies to pending cases like the one before us. We must determine, therefore, the effect of the amendment, and particularly subdivision (h), on this case.[2] We conclude that the filing and maintenance of defendants' underlying action cannot be characterized as "illegal as a matter of law" so as to exempt Soukup's malicious prosecution

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].) All further unspecified statutory references are to the Code of Civil Procedure.

[2] The parties were given an opportunity to brief the applicability of section 425.18 to the instant case.

action from the anti-SLAPP statute. We further conclude that because, as demonstrated by its enactment of section 425.18, subdivision (h), the Legislature has decided against a categorical rule exempting SLAPPbacks from the anti-SLAPP statute, we are not at liberty to read such a broader exemption into the statute. However, while we conclude that defendants are not barred from using the anti-SLAPP statute to attempt to strike Soukup's action, there remains the question of whether Soukup has nonetheless demonstrated a probability of prevailing on her malicious prosecution claim so as to defeat defendants' motion. (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) On this question, we conclude, contrary to the Court of Appeal, that she has demonstrated a probability of prevailing. Accordingly, we reverse the Court of Appeal.

## I.   FACTS AND PROCEDURAL HISTORY[3]

### A.   *Events Leading to the Filing of the Underlying Action*

### 1.   *Pension Plan Controversy*

Defendant Law Offices of Herbert Hafif (LOHH) is a professional corporation whose sole stockholder is defendant Herbert Hafif (Hafif). Soukup was employed at LOHH from September 1989 until June 1993, first as a legal secretary and then as a paralegal.

Soukup was a participant in the firm's employee pension plan. In October 1992, she and other employees of LOHH were informed that the plan was being terminated and its assets would be distributed. A portion of the distribution was to be in the form of nonregistered privately held stock. Soukup was advised by her stockbroker that this stock could not be deposited into her individual retirement account because it was not publicly traded and the value placed on the stock by the plan administrator could not be verified. She refused to sign the documentation for the transfer of the stock. This led to a confrontation with Hafif in which, according to Soukup, he told her "that

---

[3] Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1056 [18 Cal.Rptr.3d 882].) We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].)

if I did not sign . . . in the next two minutes, he would come across the desk and kick my ass. I refused to sign the documentation and left Herbert Hafif's office shaking and returned to my office downstairs."[4]

In June 1993, six weeks after her confrontation with Hafif, Soukup voluntarily terminated her employment with LOHH. On August 31, 1993, she met with an investigator from the United States Department of Labor and explained her concerns about the distribution of the LOHH employee pension assets. She provided the investigator with documents regarding the pension plan. The Department of Labor launched an investigation into LOHH's pension plan but ultimately no action was taken against LOHH.

In September 1995, Soukup filed an action in federal district court under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. §§ 1001 et seq., 1140) for recovery of pension benefits. Similar actions were filed by other former LOHH employees. LOHH filed motions to dismiss the actions, which the district court then converted into summary judgment motions and granted. On appeal, however, the Ninth Circuit reversed the summary judgment for LOHH on claims by Soukup and other employees for plan benefits. Soukup and LOHH eventually settled the federal action.

### 2. *Phillip Benson's Departure from LOHH and His Subsequent Wrongful Termination Claim*

Phillip Benson was employed at LOHH as an associate attorney during much of the time that Soukup worked there. Soukup and Benson spoke on almost a daily basis. Soukup became aware that Benson was concerned about certain business practices at the firm. Soukup, too, was starting to question some of the firm's procedures, including the billing of costs and fees. She and Benson shared their concerns.

In March or April 1993, Benson left LOHH, taking some clients with him. Relations between Benson and Hafif quickly deteriorated after he left the firm. In January 1994, Benson telephoned Soukup and told her he had filed a cross-complaint against Hafif alleging wrongful termination in violation of public policy in litigation Hafif had brought against him. He said his cross-complaint referred to two cases that Soukup had worked on while employed at LOHH. Soukup became extremely upset with him because there were confidentiality agreements in those cases that, if breached prematurely,

---

[4] Hafif denied Soukup's version of their exchange.

could put the settlements in jeopardy. Benson assured her that he had not disclosed any of the confidential terms of the settlements. It was not until January 1995 that Soukup became aware of the actual contents of Benson's complaint. She was upset to discover that he had named the clients in two cases and stated there had been settlements. However, to her knowledge, there were no repercussions from Benson's disclosure of this information.

Soukup was served with a deposition subpoena by Hafif in connection with Benson's wrongful termination claim. She attended the deposition and answered Hafif's questions regarding her knowledge of misconduct committed by Hafif or his son, Gregory Hafif, an attorney employed by LOHH.

### 3. Actions Against Hafif by His Former Clients

Between June 1993 and February 1994, a number of former clients of Hafif's filed a series of State Bar complaints and lawsuits against him generally alleging that Hafif had charged the former clients excessive costs and fees. Among these former clients was Terrie Hutton, whom Hafif had represented in a sex discrimination case against GTE. In June 1993, represented by a lawyer named Sasson Sales, Hutton sued Hafif, LOHH and others alleging causes of action for breach of fiduciary duty, fraud and professional negligence. Sales also filed actions against Hafif on behalf of Leo Barajas and Max Killingsworth, whom Hafif had represented in whistleblower suits against Northrup Corporation. Terry Schielke and Clyde Jones, whom Hafif had represented in wrongful termination actions against Lockheed Corporation, also sued Hafif. Schielke and Jones were not represented by Sales, but by another attorney.[5]

On November 20, 1993, two newspaper articles appeared in the Orange County Register about Hafif. One article was about the State Bar complaints and lawsuits. It noted that the complaints and suits were based on allegations that Hafif had overcharged his former clients, and it reported Benson's

---

[5] Hafif successfully demurred to Terrie Hutton's action. It was dismissed without leave to amend and sanctions of $25,000 were imposed upon her and Sales for bringing a frivolous lawsuit. On appeal, however, the judgment was reversed in part, as was the sanctions order. Barajas and Killingsworth voluntarily dismissed their actions against Hafif without prejudice because they had been filed by Sales without their authorization. Hafif prevailed against Schielke and Jones on their complaint and was awarded $31,196.60 on his cross-complaint. Represented by Benson, Schielke later filed a second action against LOHH, Hafif and Attorney Ronald Stock for malpractice. In November 2000, following a court trial, judgment was entered in favor of defendants.

allegation that he had left the firm for that reason. The article also noted that Hafif vehemently rejected the allegations. The second article reported the Department of Labor's investigation into LOHH's employee pension plan. The pension plan article quoted Soukup's version of her confrontation with Hafif and Hafif's denial that he had ever threatened Soukup.

B. *The Underlying Action*

1. *Hafif Files an Action for Malicious Prosecution and Other Claims Against Soukup and Others*

In July 1994, LOHH and Hafif filed an action in Orange County Superior Court against Soukup, Benson, Hutton, Killingsworth, Barajas, Sales, Schielke and Jones. The second amended complaint alleged causes of action for fraud, malicious prosecution, defamation, breach of fiduciary duty, tortious interference with business relationships and invasion of privacy.

In the fourth cause of action, for breach of fiduciary duty, it was alleged that Soukup had provided confidential information to Benson that he used to "make false and misleading allegations that the Hafif Office had intentionally charged contingent fees in excess of that to which the Hafif firm was entitled to by retainer agreement; charged excess and fictitious costs to clients to inflate the income received by the Hafif Office from contingent fee cases; failed to provide individual cost breakdowns to certain clients; and assessed arbitrary cost figures against clients' cases." The complaint further alleged that Soukup told Benson she would "wrongfully assert" that Herbert Hafif had assaulted her, a charge she later "recanted."

The malicious prosecution claim, against all defendants, alleged that "Defendants Benson, Killingsworth, Hutton, Schielke, Barajas, and Jones, pursuant to their conspiracy to defame, extort, and unlawfully hurt the business and reputation of plaintiffs . . . conspired to file a series of unjustified civil actions, initiated without probable cause, and with malice, and with the specific intent to harm plaintiffs by initiating and publicizing several specious lawsuits under an apparent plan of 'where there is this much smoke, there must be fire.' "

The defamation claim, also alleged against all defendants, was based on the publication of the article in the Orange County Register described above in which "defendants . . . accused plaintiff of cheating them by overcharging them for costs incurred in their litigation matters." No allegations were made with respect to the second article involving the Department of Labor's investigation into LOHH's employee pension plan.

The claim for tortious interference with business relationships alleged, in essence, that Benson stole clients from Hafif in part by representing that Hafif engaged in unethical practices, including charging clients inappropriate fees and costs. It was further alleged that Killingsworth, Barajas, Schielke, Jones and Hutton with the assistance of Benson and Soukup "devised a 'gameplan' wherein each sought to personally benefit by presenting a united front against plaintiffs to demand unjustified reductions in the fees and costs they owed plaintiffs for their legal services."[6]

Within a week of being served with the original complaint, Soukup called Wylie Aitken, one of Hafif's lawyers, and told him she should not have been named in the action because she had no involvement in the claims asserted in the action nor had she conspired with any of the codefendants. She asked to be dismissed from the action. He did not do so. Later, she asked both Aitken and his son, Darren, why she had been named in the action. They told her they would have to ask Hafif and would get back to her, but neither did. In 1995, during the deposition of Sasson Sales, Soukup approached Ronald Stock, another attorney representing Hafif, and asked him, "What does Mr. Hafif want from me?" Stock told her, "Well, he doesn't want your money," and added, "Mr. Hafif wants to make sure that you don't make any trouble for him in the future."[7]

In discovery, Soukup obtained a seven-column chart prepared by Hafif entitled "Benson Related Litigation." The fifth column described the "Matter Filed Against LOHH" and the final column was captioned "Matter Defeated by LOHH." For Soukup, the "Matter Filed Against LOHH" stated "Claim for pension plan irregularities," and the "Matter Defeated by LOHH" stated "Labor Department audits and investigates 20 years of records and LOHH is given a clean bill of health. The investigation is concluded."

Responding to interrogatories propounded by Hafif in connection with the underlying action, Soukup stated she had had no contact with her codefendants Killingsworth, Jones, Barajas or Terrie Hutton between July 1992 and May 1994, which encompassed the time period within which they filed the lawsuits against Hafif that were the basis of his malicious prosecution cause of action. She stated further she had had no contact with Terry Schielke after

---

[6] Soukup later filed a cross-complaint for declaratory relief against LOHH and Hafif in the event that the underlying action resulted in suits by former clients against her based on allegations of misconduct by LOHH and Hafif in cases on which Soukup had assisted. Hafif demurred to the cross-complaint and the demurrer was granted without leave to amend, but also without prejudice to refiling in the event that Soukup was sued by a former client.

[7] Stock denied having made this statement.

June 1993. She also stated that her communication with Benson after June 1993 had related either to the pension plan issue or Benson's wrongful termination claim against Hafif. In her interrogatory responses, she denied conspiring with Benson to "extort money or cases from Mr. Hafif."

In an April 1995 deposition of Hafif, Soukup asked him how she had assisted Hutton in filing her complaint against Hafif. Hafif replied, "I don't think you had anything to do with it." Similarly, when she asked him how she had assisted Clyde Jones, he testified, "You may not have been involved in the filing of the complaint. You were involved in the general work of implementing the attack on me for whatever reason." When Soukup asked him whether he would "be producing any witnesses to testify to my assistance in the malicious prosecution," Hafif testified, "No." In the same deposition, while again insisting that Soukup was part of the conspiracy to "extort money from [him] at the threat of [his] reputation," he testified, "I have no idea in her case as to what motivated her."

### 2. *Soukup Files a Motion to Strike the Underlying Action as a SLAPP*

On August 15, 1996, Soukup filed a motion to strike the underlying action as a SLAPP. Soukup argued that Hafif brought the action against her in retaliation for her complaint to the Department of Labor about LOHH's employee pension plan, the department's ensuing investigation, and her ERISA lawsuit. She contended that pursuing a complaint to an administrative agency and filing a lawsuit were constitutionally protected activities. She contended further that Hafif could not demonstrate a probability of prevailing against her on any of his claims based on a conspiracy theory because the evidence adduced during discovery demonstrated that she had had minimal or no contact with her codefendants in the timeframe during which the alleged conspiracy was planned and carried out.

On December 17, 1996, the trial court granted Soukup's motion to strike.

Hafif appealed. In an unpublished opinion filed on April 27, 2000, the Court of Appeal affirmed. Preliminarily, the Court of Appeal concluded that the action fell within the ambit of the anti-SLAPP statute. "Soukup's allegedly actionable conduct consisted of her complaints to the Department of Labor. Again, such statements are within the protective purview of the statute." Next, the Court of Appeal considered whether Hafif had established a probability of prevailing. It concluded he had not. "The basis for the complaint's allegations against . . . Soukup was the newspaper articles.

The articles accurately reflected that complaints had been made to . . . the Department of Labor and the contents of those complaints. The only evidence potentially showing merit in Hafif's claims came from [Terrie] Hutton's diaries, which were prepared for transmission to her lawyer. The trial court properly concluded they were inadmissible. Hafif failed to meet their [*sic*] burden of establishing a probability of succeeding in the claims against . . . Soukup."[8]

### C. *The Instant Action*

#### 1. *Soukup Files the Instant Action*

On April 2, 2001, Soukup filed a complaint against LOHH, Hafif, Cynthia Hafif, an attorney employed by LOHH, the Law Offices of Wylie A. Aitken, Wylie A. Aitken, the Law Offices of Ronald C. Stock and Ronald C. Stock in which she alleged causes of action for abuse of process and malicious prosecution based on the underlying action. According to Soukup's complaint: "The underlying litigation was filed in an effort to discourage or deter SOUKUP from the exercise of her legal rights as it related to both her communications with the U.S. Department of Labor, as well as her role as a witness to the questionable conduct of HAFIF, his son Greg, and the HAFIF OFFICE in connection with any pending or anticipated litigation against HAFIF or the HAFIF OFFICE. The underlying litigation was continued for six years in an effort to punish, annoy, harass or injure SOUKUP because she had exercised her constitutional rights of freedom of speech and freedom to petition the government." Soukup subsequently amended the complaint to add Gregory Hafif as a defendant.

#### 2. *Defendants File Motions to Strike Soukup's Action as a SLAPP*

All defendants except Stock joined Hafif's motion to strike Soukup's complaint as a SLAPP; Stock filed his own motion. Defendants argued that Soukup's action arose from the valid exercise of their constitutionally protected right of petition in filing the underlying action.

Defendants maintained that the evidence demonstrated they had had probable cause to bring the underlying lawsuit against Soukup on a conspiracy theory. They cited the following evidence: (1) the lawsuits filed by Hafif's

---

[8] The Terrie Hutton "diaries," which figure prominently in this case, were hundreds of pages of handwritten and typed notes made by Hutton documenting her communications with other former clients of Hafif and with her attorney, Sasson Sales, in the period prior to the filing of the former clients' actions against Hafif. The same Court of Appeal opinion that affirmed the order striking the underlying action as a SLAPP against Soukup also affirmed the order striking the underlying action as a SLAPP against Hutton.

former clients to "coerc[e] [LOHH and Hafif] into waiving their right to fees and costs in the lawsuits they had previously worked on," and Soukup's filing of her cross-complaint in the underlying action; (2) the Court of Appeal's reference to Terrie Hutton's diaries as showing potential merit in the underlying action; (3) the denial of Terrie Hutton's motion for summary judgment in the underlying action in which the trial court found that her diaries provided evidence of her participation in the alleged conspiracy against Hafif; and (4) the statement of decision in *Schielke v. LOHH, Herbert Hafif and Ronald Stock*, filed on November 8, 2000, in which the trial court granted judgment for the defendants in Schielke's malicious prosecution action based on a finding the underlying action was supported by probable cause as demonstrated by "the journals or diary of one Terr[ie] Hutton."

Among the exhibits attached to Hafif's motion were hundreds of pages of the Hutton diaries. In Hafif's declaration in support of the motion to strike, he cited passages from the diaries as evidence of the alleged conspiracy between the defendants in the underlying action "to have me waive my fees and costs." Those passages documented phone calls between Terrie Hutton, Sasson Sales, Terry Schielke and Max Killingsworth regarding the filing of State Bar complaints and actions against Hafif and also asserted that Schielke and Clyde Jones had provided documents to the Orange Country Register reporter who wrote the article about Hafif that was the basis of his defamation claim in the underlying action. None of the passages cited by Hafif referred to Soukup.

In her opposition, Soukup argued that defendants should not have the benefit of the anti-SLAPP statute given that the underlying action had itself been dismissed as a SLAPP because it was "by definition a lawsuit to chill [her] valid exercise of constitutional rights of freedom of speech [and] not brought for the valid redress of grievances and an abuse of judicial process." "Therefore, there can be no basis for the [defendants'] special motion to strike in the instant case since they are not capable of meeting the first prong of the statute which requires a showing that their underlying action was valid or legitimate."

Soukup alternatively contended that, even if the anti-SLAPP statute applied, defendants' motions should be dismissed because she could demonstrate a probability of prevailing on the merits. She averred in her declaration that she had had little or no contact with her codefendants during the timeframe in which Hafif had alleged in the underlying action she had conspired with them. Barajas and Killingsworth filed declarations stating that they had never met Soukup prior to the filing of the underlying action. Terrie

Hutton filed a declaration that stated the only time she had met Soukup prior to the filing of the underlying action was when Soukup screened her as a client for Hafif. All three denied that they had conspired with Soukup against Hafif or that she had encouraged them to file the lawsuits against him that were the basis of his malicious prosecution claim.

In their reply, defendants argued: "In the present case, it is undisputed that defendants' acts in furtherance of their constitutional right of petition consisted of nothing more than the filing and maintenance of the underlying civil action out of which Soukup's malicious prosecution and abuse of process claims directly arise . . . . Although Hafif's claims were found to be potentially without merit, that does not mean that Hafif has done anything illegal or that those claims were brought without probable cause."

### 3.  *Stock's Motion to Strike Soukup's Action*

Stock filed his own motion to strike Soukup's claim under the anti-SLAPP statute. In addition to repeating arguments advanced by Hafif, Stock argued that, as to him, the motion should be granted because he had "no role or participation in the decision to file, or the filing of the underlying action" nor had Soukup shown that "Stock had knowledge that the factual allegations of the underlying complaint were false." In her opposition, Soukup argued that the filing and prosecution of the underlying action was not a valid exercise of protected rights for purposes of the anti-SLAPP action and that Stock's participation in the prosecution of the underlying action was more significant than he admitted.

On July 27, 2001, the trial court denied Hafif's motion to strike Soukup's complaint and, on September 4, 2001, also denied Stock's motion.

Following denial of the motions to dismiss, the trial court sustained a demurrer to the cause of action for abuse of process without leave to amend.

### 4.  *Proceedings in the Court of Appeal and This Court*

Hafif and his fellow defendants appealed the denial of their motion to strike Soukup's actions. Stock separately appealed. The Court of Appeal affirmed the denial of Hafif's motion to strike. In a separate opinion, the Court of Appeal also affirmed the denial of Stock's motion to strike. Hafif and Stock then sought review in this court. We granted their petitions and held their cases for *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th

728, which was then pending before this court. Following our decision in *Jarrow* and *Navellier v. Sletten* (2002) 29 Cal.4th 82 [124 Cal.Rptr.2d 530, 52 P.3d 703], we dismissed review and transferred the cases back to the Court of Appeal to reconsider its decisions in light of *Jarrow* and *Navellier*. The Court of Appeal summarily reversed its earlier rulings and held that the motions to strike should have been granted. Soukup petitioned for review and we granted her petition.

## II. DISCUSSION

### A. Are Defendants Barred from Using the Anti-SLAPP Statute to Strike Soukup's Complaint?

#### 1. Introduction

■ Section 425.16 provides in relevant part that: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "The Legislature enacted section 425.16 to prevent and deter 'lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by ending them early and without great cost to the SLAPP target." ' [Citation.] Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958]; see *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 737 [section 425.16 "is a procedural device for screening out meritless claims"].)

"Section 425.16 posits . . . a two-step process for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 88.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even

minimal merit—is a SLAPP, subject to being stricken under the statute." (*Id.* at p. 89.)

■ The Legislature's purpose in enacting the anti-SLAPP statute is set forth in its findings and declarations. "The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).) Furthermore, to accomplish this purpose the Legislature has directed that the statute "be construed broadly." (*Ibid.*) To this end, when construing the anti-SLAPP statute, "[w]here possible, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . .' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 733, quoting *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) Where this principle is applied, recourse to extrinsic material like legislative history is unnecessary, but in our prior cases interpreting section 425.16, we have more than once consulted that history and found in it material that has buttressed our construction of the statutory language. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120 [81 Cal.Rptr.2d 471, 969 P.2d 564]; *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 61; *Jarrow, supra,* 31 Cal.4th at p. 736.) We apply these principles as we take up the question on which we granted review in this case involving the latest twist in anti-SLAPP law—the SLAPPback.

■ The SLAPPback phenomenon is concisely explained in the legislative material accompanying Assembly Bill No. 1158 (2005–2006 Reg. Sess.), the bill ultimately enacted by the Legislature as section 425.18.[9] A SLAPPback suit is an action, typically for malicious prosecution "filed by the target of a SLAPP suit against the SLAPP filer after the dismissal of the SLAPP suit as a result of the target's appropriate use of the SLAPP statute." (Assem. Com. on

---

[9] Defendants request that we take judicial notice of the legislative history surrounding Assembly Bill No. 1158 (2005–2006 Reg. Sess.). (*Martin v. Szeto* (2004) 32 Cal.4th 445, 452, fn. 9 [9 Cal.Rptr.3d 687, 84 P.3d 374].) Soukup objects to the extent that some of the legislative history reflects the views of individual legislators or advocates of the legislation rather than the Legislature as a whole. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 38–39 [34 Cal.Rptr.3d 520].) The legislative history in this case is relatively brief and our citation to it is limited to various versions of the legislation and committee reports, all of which are indisputably proper subjects of judicial notice. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513].) Therefore, we grant defendants' request for judicial notice of the legislative history material. Defendants also request that we take judicial notice of materials in the case of *Hutton v. Hafif* (May 11, 2004, B162572) (nonpub. opn.) review denied, July 28, 2004, S125728, including the Court of Appeal's opinion in that case and in proceedings that followed our denial of review. These materials are not relevant to any issue in this case and the request is denied.

Judiciary, Rep. on Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as introduced Feb. 22, 2005, p. 1.) The purpose of a SLAPPback is to seek compensation for damages beyond the attorney fees and costs awarded to the defendant who prevails on the special motion to strike under the anti-SLAPP statute. (See § 425.16, subd. (b)(3).) "SLAPP victims . . . commonly experience stress-related health issues, strained family relationships, and financial distress or even insolvency. The only way a SLAPP victim can recover for these damages is to pursue a legal claim against the person or entity that filed the original SLAPP." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as introduced Feb. 22, 2005, p. 4.)

The filing of a SLAPPback does not end the roundelay of special motions to strike under the anti-SLAPP statute. The SLAPPback defendant may in turn file such a motion arguing, as do defendants here, that the filing and maintenance of the underlying action that is the basis of the SLAPPback was itself activity protected by the anti-SLAPP statute. (*Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at p. 1115 [" ' "[t]he constitutional right to petition . . . includes the basic act of filing litigation or otherwise seeking administrative action." ' "].) We granted review to examine whether permitting such defendants to avail themselves of the anti-SLAPP statute is consistent with the legislative intent behind section 425.16. While the case was pending before us, however, the Legislature itself addressed the issue by enacting section 425.18, to which we now turn.

2. *Section 425.18*

a. *Applicability of Section 425.18 to Pending Cases*

■ Before we substantively discuss section 425.18, we address the preliminary question of whether it applies to pending cases, like the one before us, that originated prior to section 425.18's effective date. The anti-SLAPP statute is a procedural statute, the purpose of which is to screen out meritless claims. (*Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 737.) It is well settled that "applying changed procedural statutes to the conduct of existing litigation, even though the litigation involves an underlying dispute that arose from conduct occurring before the effective date of the new statute, involves no improper retrospective application because the statute addresses conduct in the future." (*Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 689 [10 Cal.Rptr.3d 702]; see *Tapia v. Superior Court* (1953) 53 Cal.3d 282, 288-291 [279 Cal.Rptr. 592, 807 P.2d 434]; *Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 394 [182 P.2d 159].) Both we and the Court of Appeal have applied this principle to hold that amendments to the anti-SLAPP statute apply to cases pending before the effective date of the amendments. (*Briggs v. Eden Council for Hope &*

*Opportunity, supra,* 19 Cal.4th at p. 1119, fn. 7 [language added to section 425.16, subdivision (a) requiring broad construction of the statute applies to pending cases because section 425.16 "is a procedural statute that properly is applied prospectively to an existing cause of action"]; *Brenton v. Metabolife Internat., Inc., supra,* 116 Cal.App.4th at pp. 687–691 [enactment of section 425.17 exempting certain claims from the ambit of the anti-SLAPP statute applies to pending cases]; accord, *Physicians Com. for Responsible Medicine v. Tyson Foods* (2004) 119 Cal.App.4th 120, 125–130 [13 Cal.Rptr.3d 926]; *Metcalf v. U-Haul International, Inc.* (2004) 118 Cal.App.4th 1261, 1265–1266 [13 Cal.Rptr.3d 686].)

■ Section 425.18 creates different procedures for SLAPPbacks than those that ordinarily apply to motions to strike under the anti-SLAPP statute and also, like section 425.17, "amend[s] section 425.16 to except certain claims from applicability of the statutorily conferred remedy of the screening mechanism provided by section 425.16." (*Brenton v. Metabolife Internat., Inc., supra,* 116 Cal.App.4th at pp. 689–690.) In neither event does section 425.18 "impose new, additional or different liabilities based on past conduct or deprive [defendants] of any substantive defense to the action." (*Brenton v. Metabolife Internat., Inc., supra,* 116 Cal.App.4th at p. 690.) We conclude, therefore, that section 425.18 applies to the case before us.[10]

b. *Substantive Provisions of Section 425.18*

Section 425.18 defines a SLAPPback as "any cause of action for malicious prosecution or abuse of process arising from the filing or maintenance of a prior cause of action that has been dismissed pursuant to a special motion to strike under Section 425.16." (§ 425.18, subd. (b)(1).) In its findings and declarations, the Legislature states "that a SLAPPback cause of action should be treated differently, as provided in this section, from an ordinary malicious prosecution action because a SLAPPback is consistent with the Legislature's intent to protect the valid exercise of the constitutional rights of free speech and petition by its deterrent effect on SLAPP (strategic lawsuit against public participation) litigation and by its restoration of public confidence in participatory democracy." (§ 425.18, subd. (a).)

■ Section 425.18 treats SLAPPbacks differently from ordinary malicious prosecution actions in two ways. First, it makes inapplicable to special

---

[10] The parties do not contend to the contrary, except for Stock who purports to find in the legislative history of Assembly Bill No. 1158 (2005–2006 Reg. Sess.) an indication that the Legislature considered, but rejected, prospective application of the section by deleting language that stated an intent "to apply this amendment to cases pending at the time this act is adopted." This language, however, was in the context of an amendment to section 425.16, subdivision (f), not to section 425.18. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as introduced, Feb. 22, 2005, p. 7.) Therefore, it has no bearing on whether section 425.18 applies to pending cases.

motions to strike a SLAPPback certain procedures that would normally apply to such motions and sets forth different procedures. Thus, the statute states that the "provisions of subdivisions (c) [prevailing defendants entitled to attorney fees and costs], (f) [motion to strike ordinarily to be filed within 60 days of the service of complaint], (g) [discovery ordinarily stayed upon filing of notice of motion to strike], and (i) [providing for appeal of order granting or denying special motion] of Section 425.16, and paragraph (13) of subdivision (a) of Section 904.1 [appeal of order granting or denying special motion to strike], shall not apply to a special motion to strike a SLAPPback." (§ 425.18, subd. (c).) Instead, section 425.18, subdivision (d) allows a motion to strike a SLAPPback to be brought within 120 days of the service of the complaint or, subject to the court's discretion, as long as six months after the service of the complaint or, "in extraordinary cases" "at any later time." (§ 425.18, subd. (d)(1)(A)–(C).) Subdivision (e) permits the plaintiff opposing the special motion to strike to file an ex parte application for a continuance to obtain discovery. (§ 425.18, subd. (e).) Subdivision (f) allows the plaintiff to recover costs and attorney fees if the court finds that the motion to strike "is frivolous or solely intended to cause unnecessary delay," but makes no provision for such costs and fees to be awarded to the prevailing defendants. (§ 425.18, subd. (f).) Subdivision (g) limits appellate review of the denial of a motion to strike, in whole or part, to review by peremptory writ. (§ 425.18, subd. (g).)

The import of these provisions is to stack the procedural deck in favor of the SLAPPback plaintiff confronted with a special motion to strike. They do so by providing the plaintiff with both a longer timeframe—and the means with which—to conduct discovery that might yield evidence to resist the motion to strike, exempting the plaintiff from fees and costs even if the plaintiff's SLAPPback action is stricken and minimizing the delays and expense the plaintiff might otherwise incur while the case is on appeal by limiting the unsuccessful defendant to writ review. (See *Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th at p. 195 [because appeal of order denying special motion to strike stays all further trial court proceedings "some anti-SLAPP appeals will undoubtedly delay litigation even though the appeal is frivolous or insubstantial"].)

The second way in which section 425.18 treats SLAPPbacks differently from ordinary malicious prosecution actions is to provide a limited exemption for SLAPPbacks from the anti-SLAPP statute in subdivision (h). That subdivision provides: "A special motion to strike may not be filed against a SLAPPback by a party whose filing or maintenance of the prior cause of action from which the SLAPPback arises was illegal as a matter of law" (§ 425.18, subd. (h).) It is the applicability of this provision to the instant case that concerns us and it is that question we now address.

### 3. *Applicability of Subdivision (h)*

Soukup's malicious prosecution action fits the definition of a SLAPPback set forth in section 425.18.[11] She contends that the filing and maintenance of the underlying action violated state and federal labor laws, specifically Labor Code section 1102.5 and 29 United States Code section 1140 and, therefore, section 425.18, subdivision (h) bars defendants from seeking to strike her action as a SLAPP. Since a motion to strike a SLAPPback is prohibited only if the "prior cause of action from which the SLAPPback arises was illegal as a matter of law" (§ 425.18, subd. (h)), we must determine the meaning of the phrase "illegal as a matter of law." As in our prior anti-SLAPP jurisprudence, we begin by construing the statute "strictly by its terms," to ascertain the " 'Legislature's intent, as exhibited by the plain meaning of the actual words of the law.' " (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 59.)

█ An illegal act is an act "[f]orbidden by law." (Black's Law Dict. (7th ed. 1999), p. 750.)[12] By specifying that only those defendants whose filing or maintenance of the underlying action was illegal as a matter of law are barred from bringing a special motion to strike a SLAPPback, it is clear that the Legislature intended to require something more than that the underlying action was dismissed as a SLAPP before section 425.18, subdivision (h) applies. Had the Legislature intended to create a categorical rule exempting all SLAPPbacks from the anti-SLAPP statute, it could have done so. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 735 ["[t]he Legislature clearly knows how to create an exemption from the anti-SLAPP statute when it wishes to do so"].) Instead, it created the narrower exemption set forth in section 425.18, subdivision (h).

Our conclusion is buttressed by the relevant legislative history surrounding Assembly Bill No. 1158 (2005–2006 Reg. Sess.), which shows the Legislature explicitly considered and rejected a categorical rule exempting all SLAPPbacks from section 425.16. The Senate Committee on the Judiciary report on Assembly Bill No. 1158 noted that "[a]s passed by the Assembly, [Assembly Bill No.] 1158 proposed to make the anti-SLAPP motion inapplicable in any SLAPPback action (any malicious prosecution claim or any other cause of action arising from the filing or maintenance of a prior cause [of action] that has been dismissed pursuant to the granting of an anti-SLAPP motion.)" (Sen.

---

[11] Indeed, the legislative history reveals that early versions of Assembly Bill No. 1158 (2005–2006 Reg. Sess.) specifically stated that one object of the SLAPPback amendments to section 425.16 was to overrule the Court of Appeal's opinion in *Soukup v. Stock*; this language did not survive into the final version of section 425.18. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as introduced Feb. 22, 2005, p. 7.)

[12] Stock asserts that the law in question must be a criminal statute, but he fails to provide any support for his premise that "illegal" refers only to criminal acts or that the Legislature, in enacting section 425.18, intended to refer only to criminal violations.

Com. on Judiciary, Analysis of Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as amended Apr. 25, 2005, p. 13.) But, as the committee report explained, a number of concerns led to the rejection of a categorical exemption. First, referring to prior court decisions that had followed the Legislature's mandate to broadly construe the anti-SLAPP statute, the report suggested that continued broad construction of the statute might "result in cases of first impression where the 'little-guy' plaintiff was truly not engaging in SLAPP litigation but is nonetheless found to be a SLAPPer. That person would be precluded from using the anti-SLAPP law to defend him or herself against the follow-up SLAPPback SLAPP suit. . . . [¶] . . . [Thus] a categorical exemption seemed fraught with the risk of unintended consequences. Can every future SLAPP-back claim be presumed to not be a SLAPP case itself?" (*Id.* at p. 15.) Second, the report expressed the concern that a categorical exemption would abrogate our holding in *Jarrow* that malicious prosecution actions are not exempt from scrutiny under the anti-SLAPP law. (*Ibid.*) It was evidently in light of these concerns that the Legislature crafted the narrower exemption based on the illegality of the underlying action.

The Legislature further narrowed the exemption in section 425.18, subdivision (h) by requiring that the illegality be established "as a matter of law." In adding this proviso, the Legislature appears to have had in mind decisions by the Court of Appeal that have held that the anti-SLAPP statute is not available to a defendant who claims that the plaintiff's cause of action arises from assertedly protected activity when that activity is illegal as a matter of law and, for that reason, not protected by the First Amendment. (See, e.g., *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 [102 Cal.Rptr.2d 864] (*Paul*), disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.)[13]

In *Paul*, the plaintiff sued the defendants, alleging that they had interfered with his candidacy for city council by making illegal contributions to one of his opponents, in violation of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.). The defendants moved to strike the suit under the anti-SLAPP statute on the grounds that the campaign contributions were in furtherance of their free speech rights and thus protected by the statute. Their moving papers, however, "show[ed] that they in fact did violate the Political Reform Act when they laundered campaign contributions to persons running for local and state offices." (*Paul, supra,* 85 Cal.App.4th at p. 1361.) In reversing the trial court's order granting the motion to strike, the Court of Appeal held that because the "defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection . . . as a matter of law . . . such activities

[13] We address the viability of this exception in the companion to this case, *Flatley v. Mauro* (2006) 39 Cal.4th 299 [46 Cal.Rptr.3d 606, 139 P.2d 2].

[were] *not* a valid exercise of constitutional rights as contemplated by section 425.16." (*Id.* at p. 1367.) The court emphasized that "there was no dispute on the point" but "had there been a factual dispute as to the legality of defendants' actions, then we could not so easily have disposed of defendants' motion." (*Ibid.*)

In *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449 [125 Cal.Rptr.2d 534], the plaintiffs, a group organized to support the reelection of former Governor Davis, brought an action against defendant taxpayer group alleging that, by producing and running a television advertisement critical of the Governor, the taxpayer group had violated certain provisions of the Political Reform Act. The taxpayer group filed a special motion to strike the complaint as a SLAPP. The trial court denied the motion. On appeal, the plaintiffs argued, as had the plaintiff in *Paul*, that the defendant was not entitled to use the anti-SLAPP statute because the conduct for which it claimed constitutional protection was illegal. The Court of Appeal distinguished *Paul*. "Here in contrast, appellant neither has conceded nor does the evidence conclusively establish the illegality of its communications made during the course of debate on political issues. [Citations.] Appellant claims its advertisement constitutes protected speech that cannot be regulated by the Political Reform Act, and consequently no violation of law occurred." (*Id.* at p. 459.) Because the issue of the legality of the taxpayer group's conduct was disputed, the Court of Appeal found that "the threshold element in a section 425.16 inquiry has been established" and the "asserted violation of the Political Reform Act . . . is an issue we must examine in the context . . . of the respondent's burden to construct a prima facie showing of the merits of its case." (*Id.* at p. 460; see also *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 910–911 [120 Cal.Rptr.2d 576] ["[i]n short, conduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage . . . simply because it is *alleged* to have been unlawful or unethical"]; *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1090 [114 Cal.Rptr.2d 825] [the *Paul* exception applies "where the defendant indisputably concedes the claim arose from illegal or constitutionally unprotected activity".)

Under these decisions, if a defendant's assertedly protected constitutional activity is alleged to have been illegal and, therefore, outside the ambit of the anti-SLAPP statute, the illegality must be established as a matter of law either through the defendant's concession or because the illegality is conclusively established by the evidence presented in connection with the motion to strike. Although the legislative history surrounding Assembly Bill No. 1158 (2005–2006 Reg. Sess.) does not expressly refer to these cases, nonetheless, a Senate Committee on the Judiciary analysis notes that an early version of the bill would have incorporated "indisputably illegal conduct" as the standard by which to evaluate whether the filing and maintenance of the underlying action

was illegal as a matter of law. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as amended Apr. 25, 2005, p. 10.) In language echoing the *Paul* decision, the analysis states that "if there is a genuine issue of material fact that turns on the credibility of [a] witness or on proper inferences to be drawn from indisputable facts, then the matter is not indisputable." (*Ibid.*) While the final version of section 425.18, subdivision (h) substituted the phrase "illegal as a matter of law" for "indisputably illegal conduct," there is no indication in the legislative history that a different meaning was intended.[14]

■ In summary, section 425.18, subdivision (h) provides a narrow exception to the rule that malicious prosecution actions are subject to scrutiny under the anti-SLAPP statute, which applies only if (1) the malicious prosecution action is a SLAPPback and (2) the filing and maintenance of the underlying action was illegal as a matter of law. The burden of establishing that the underlying action was illegal as a matter of law should be shouldered by the plaintiff in such cases. This is because the Legislature's decision not to create a categorical exemption for SLAPPbacks demonstrates a legislative preference that the anti-SLAPP statute operate in the ordinary fashion in most SLAPPback cases, subject, of course, to the special procedural rules applicable to all motions to strike a SLAPPback. In the ordinary SLAPP case, the defendant's initial burden in invoking the anti-SLAPP statute is to make " 'a threshold showing that the challenged cause of action is one arising from protected activity.' " (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 733.) There is no further requirement that the defendant initially demonstrate his or her exercise of constitutional rights of speech or petition was valid as a matter of law. (*Navellier v. Sletten, supra,* 29 Cal.4th at pp. 94–95.) Consistent with these principles, a defendant who invokes the anti-SLAPP statute should not be required to bear the additional burden of demonstrating in the first instance that the filing and maintenance of the underlying action was not illegal as a matter of law. Moreover, placing this burden on the defendant would be impractical and inefficient because it would require the defendant to identify and address every conceivable statute that might have had some bearing on the underlying action and then prove a negative—that the underlying action did not violate any of these laws.

■ Accordingly, once the defendant has made the required threshold showing that the challenged action arises from assertedly protected activity, the plaintiff may counter by demonstrating that the underlying action was

---

[14] Further support for our conclusion that the Legislature's adoption of the phrase "illegal as a matter of law" referred to the *Paul* decision comes in the form of a subsequent Senate Committee on the Judiciary analysis of Assembly Bill No. 1158 (2005–2006 Reg. Sess.) that explains that this concept was drawn in part from the amicus curiae brief filed by the Attorney General in *Flatley v. Mauro, supra,* 39 Cal.4th 299 wherein the Attorney General argues that the *Paul* exception is consistent with the Legislature's intent in enacting section 425.16.

illegal as a matter of law because either the defendant concedes the illegality of the assertedly protected activity or the illegality is conclusively established by the evidence presented in connection with the motion to strike. In doing so, the plaintiff must identify with particularity the statute or statutes violated by the filing and maintenance of the underlying action. (See *Paul, supra,* 85 Cal.App.4th at pp. 1360–1361.) This requirement of identifying a specific statute, violation of which the plaintiff contends is illegal as a matter of law, is consistent with the narrow nature of the exemption set forth in section 425.18, subdivision (h) because it prevents a plaintiff from advancing a generalized claim that a defendant's conduct was illegal and therefore subject to the exemption. In this same vein, the requirement of specificity provides notice to both the defendant and the court about the particular statute or statutes the defendant is alleged to have violated as a matter of law so as to allow the defendant to intelligibly respond to, and the court to assess, the claim. Additionally, as part of the plaintiff's burden of demonstrating illegality as a matter of law, the plaintiff must show the specific manner in which the statute or statutes were violated with reference to their elements. A generalized assertion that a particular statute was violated by the filing or maintenance of the underlying action without a particularized showing of the violation will be insufficient to demonstrate illegality as a matter of law.

In light of this analysis of section 425.18, subdivision (h), we turn to Soukup's claim that defendants' filing and maintenance of the underlying action was illegal as a matter of law because it violated Labor Code section 1102.5, subdivision (b) and 29 United States Code section 1140. To reiterate our earlier discussion with reference to Soukup's specific claim, she bears the burden of making a particularized showing that defendants' initiation and maintenance of the underlying action violated these statutes as a matter of law. For the reasons we set forth below, we conclude that she has failed to carry this burden.

Labor Code section 1102.5, subdivision (b) provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

Labor Code section 1102.5 is a whistleblower statute, the purpose of which is to "encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) " ' "To establish a prima facie case of retaliation, a plaintiff must show that she engaged in protected activity, that she was thereafter subjected to adverse employment action by

her employer, and there was a causal link between the two." ' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [105 Cal.Rptr.2d 652].)

Thus, it appears that a prerequisite to asserting a violation of Labor Code section 1102.5 is the existence of an employer-employee relationship at the time the allegedly retaliatory action occurred. In this case, however, as Soukup's counsel conceded at argument, Soukup was not an employee of LOHH at the time she complained to the Department of Labor about LOHH's pension plan distribution or when the underlying action was filed. Accordingly, she fails to demonstrate how defendants' filing and maintenance of the underlying action, even if it was in some broad sense retaliatory, violated the specific provisions of Labor Code section 1102.5, much less that the statute rendered defendants' conduct illegal as a matter of law.

Title 29 United States Code section 1140 states in pertinent part that it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary" of an employee benefit plan either for "exercising any right to which he is entitled" or "because he has given information or has testified or is about to testify in any inquiry or proceeding" relating to such plans.[15] "The latter part of [section 1140] is a whistleblower provision . . . designed to encourage individuals with knowledge of potential ERISA violations to share information in order that such violations may be redressed. To this end, [section 1140] prohibits employers from retaliating against those who provide information or testimony in 'any inquiry or proceeding related to [ERISA].' " (*Klein v. Banknorth Group, Inc.* (D.Vt. 1997) 977 F.Supp. 302, 304; see *Teumer v. General Motors Corp.* (7th Cir. 1994) 34 F.3d 542, 550 ["[a] plaintiff seeking relief under [section 1140] must establish that the complained of action affecting his employment situation was taken by his employer with the specific intent of interfering with his benefit rights"].)

Accordingly, it appears that a claim that this statute was violated can be made either by an employee-participant of an employee benefit plan or a beneficiary of such plan. For the same reason that Soukup is unable to show that defendants' filing of the underlying action violated Labor Code section 1102.5—the absence of an employer-employee relationship at the time the allegedly retaliatory action was taken—she is unable to show a violation of the federal statute based on her status as an employee of LOHH. Moreover, Soukup does not contend, much less demonstrate, that she can assert a violation of the federal statute as a beneficiary of the pension plan. Here, too, then, she fails to show that defendants' filing and maintenance of the underlying action violated the federal statute as to her, much less that

---

[15] This section is part of the ERISA statute. (29 U.S.C. § 1001 et seq.)

defendants' conduct was illegal as a matter of law for purposes of 29 United States Code section 1140.[16]

 Soukup alternatively argues that, even if the underlying action was not illegal as a matter of law, it was nonetheless a sham suit and on this ground defendants should be barred from recourse to the anti-SLAPP statute. Soukup relies on United States Supreme Court decisions that, in various contexts, have concluded that litigation undertaken without a reasonable basis, but merely to harass or hinder another party is sham litigation undeserving of the First Amendment protection that ordinarily immunizes petitioning activity. (*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (1993) 508 U.S. 49, 60–61 [123 L.Ed.2d 611, 113 S.Ct. 1920]; *Bill Johnson's Restaurants, Inc. v. NLRB* (1983) 461 U.S. 731, 743 [76 L.Ed.2d 277, 103 S.Ct. 2161] (*Bill Johnson's Restaurants*).) This doctrine derives from decisions reached in the context of antitrust law and is often referred to as the *Noerr-Pennington* doctrine. (*United Mine Workers v. Pennington* (1965) 381 U.S. 657, 670 [14 L.Ed.2d 626, 85 S.Ct. 1585]; *Eastern R. Conf. v. Noerr Motors* (1961) 365 U.S. 127, 144 [5 L.Ed.2d 464, 81 S.Ct. 523].) "The *Noerr-Pennington* doctrine, as refined and explained in *Real Estate Investors*, has two prongs. First, . . . the challenged action must have been undertaken with an improper motive. That is, it must have been done not with the hope of securing a favorable governmental result, but solely to harass and hinder another party. The other prong of the doctrine is that the challenged action must have been objectively baseless. Absent such a patent lack of merit, an action protected under the First Amendment by the right of petition cannot be the basis for litigation." (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 22 [43 Cal.Rptr.2d 350].)

Invoking this doctrine, Soukup cites language from the *Bill Johnson* decision in which the Supreme Court stated that "baseless litigation is not immunized by the First Amendment right to petition." (*Bill Johnson's Restaurants, supra,* 461 U.S. at p. 743.) Equating baselessness with lack of probable cause (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 820 [123 Cal.Rptr.2d 19, 50 P.3d 733]), she contends that the absence of probable cause to support the underlying action renders it sham litigation unprotected by the First Amendment. Therefore, she reasons, defendants were not entitled to avail themselves of the anti-SLAPP statute because the purpose of that statute is to promote the exercise of protected speech and petition rights.

---

[16] Soukup also argues that the illegality of the underlying action is established by the finding of the Court of Appeal that her complaint to the Department of Labor was the basis for the underlying action when it affirmed the dismissal of the action as a SLAPP. This finding, however, is not the equivalent of a finding that the underlying action was illegal.

We disagree. First, *Bill Johnson's Restaurants* is not directly controlling, nor does Soukup argue that it is, because that case involved the National Labor Relations Act (29 U.S.C. § 151 et seq.) rather than a statute in any way analogous to the anti-SLAPP statute. In *Bill Johnson's Restaurants*, the Supreme Court held that it is an "enjoinable unfair labor practice to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights" protected by the act relating to union organizing. (*Bill Johnson's Restaurants, supra,* 461 U.S. at p. 744.) Second, the sham suit exemption urged upon us by Soukup would be significantly broader than that which the Legislature created in section 425.18, subdivision (h). Third, the legislative history surrounding the enactment of section 425.18, subdivision (h) demonstrates that the Legislature was aware of the principle articulated in the *Bill Johnson's Restaurants* decision to which Soukup refers and adopted it only to the extent it supported the narrow exemption from the anti-SLAPP statute for SLAPPbacks set forth in subdivision (h).

█ In a comment addressing subdivision (h) of section 425.18, the Senate Committee on the Judiciary report states: "In Bill Johnson's Restaurants, Inc. v. National Labor Relations Board, 461 U.S. 731 [76 L.Ed.2d 277, 103 S.Ct. 2161] (1983), the U.S. Supreme Court held that 'baseless litigation is not immunized by the First Amendment right to petition.' [¶] [Assembly Bill No.] 1158's proposed Section 425.18(h) . . . adopts this principle in the SLAPPback context and provides that 'a special motion to strike may not be filed against a SLAPPback by a party whose filing or maintenance of the prior cause of action from which the SLAPPback arises was illegal as a matter of law.' . . . [¶] Thus, where a person whose prior SLAPP lawsuit was illegal as a matter of law, as shown by being thrown out on a special motion to strike, and the SLAPP victim files a subsequent malicious prosecution action, that bad actor cannot use the anti-SLAPP law to defend against the lawsuit or to vex and harass the SLAPP victim." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1158 (2005–2006 Reg. Sess.) as amended Aug. 15, 2005, pp. 11–12.) Thus, the Legislature concluded that, for purposes of the anti-SLAPP statute, underlying actions illegal as a matter of law are a species of "baseless litigation" undeserving of First Amendment protection, as that general principle was articulated in the *Bill Johnson's Restaurants* decision, but it declined to apply that principle to fashion the kind of categorical exemption for SLAPPbacks that Soukup, citing the same principle, urges upon us. Where the Legislature has spoken we are not at liberty to create a broader exception for sham litigation.

█ We therefore conclude that Soukup has failed to show that the filing and maintenance of the underlying action were illegal as a matter of law for purposes of section 425.18, subdivision (h). Therefore, defendants are not barred from proceeding with their motions to strike Soukup's action under the anti-SLAPP statute. As such, the motions are subject to the usual analysis

under which defendants are required to make a threshold showing that Soukup's malicious prosecution claim arises from protected activity. "By definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit." (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 735.) The filing of lawsuits is an aspect of the First Amendment right of petition. (*Id.* at p. 736, fn. 5.) Accordingly, defendants have fulfilled the required threshold showing. This does not end our analysis, however. "If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.) The Court of Appeal concluded that Soukup had not done so. Soukup contends that the court erred. We agree and on this ground reverse the Court of Appeal.

B. *Has Soukup Shown a Probability of Prevailing on Her Malicious Prosecution Claim?*

To establish a probability of prevailing, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880]; accord, *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 274 [105 Cal.Rptr.2d 674].) For purposes of this inquiry, "the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 821.) In making this assessment it is "the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . ." (*HMS Capital, Inc. v. Lawyers Title Co., supra,* 118 Cal.App.4th at p. 212.) The plaintiff need only establish that his or her claim has "minimal merit" (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89) to avoid being stricken as a SLAPP. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 738 ["the anti-SLAPP statute requires only 'a minimum level of legal sufficiency and triability' [citation]"], quoting *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5 [97 Cal.Rptr.2d 179, 2 P.3d 27].)[17]

---

[17] The parties made various evidentiary objections to each other's affidavits and the attachments thereto in the trial court, but the trial court declined to rule on the objections and neither side pressed for a ruling. Therefore, the objections are deemed to be forfeited. (*Gallant v. City of Carson* (2005) 128 Cal.App.4th 705, 710 [27 Cal.Rptr.3d 318]), and "in reviewing the trial court's order denying the motion, we consider all the evidence presented by the parties." (*Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1014, fn. 4 [5 Cal.Rptr.3d 668].)

■   To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal.Rptr. 336, 765 P.2d 498].)

The question of probable cause is "whether, as an objective matter, the prior action was legally tenable or not." (*Sheldon Appel Co. v. Albert & Oliker, supra*, 47 Cal.3d at p. 868.) "A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164–165 [80 Cal.Rptr.2d 66].) "In a situation of complete absence of supporting evidence, it cannot be adjudged reasonable to prosecute a claim." (*Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 597 [71 Cal.Rptr.2d 657].) Probable cause, moreover, must exist for every cause of action advanced in the underlying action. "[A]n action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted . . . ." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 57, fn. 5 [118 Cal.Rptr. 184, 529 P.2d 608]; see *Crowley v. Katleman* (1994) 8 Cal.4th 666, 679, 695 [34 Cal.Rptr.2d 386, 881 P.2d 1083].)

"The 'malice' element . . . relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action. [Citation.] The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose. [Citation.] The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive." (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 494 [78 Cal.Rptr.2d 142]; see *Albertson v. Raboff* (1956) 46 Cal.2d 375, 383 [295 P.2d 405] ["[t]he malice required in an action for malicious prosecution is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted primarily for an improper purpose"].) Malice "may range anywhere from open hostility to indifference. [Citations.] Malice may also be inferred from the facts establishing lack of probable cause." (*Grindle v. Lorbeer* (1987) 196 Cal.App.3d 1461, 1465–1466 [242 Cal.Rptr. 562].)

The parties do not dispute that the underlying action in this case was terminated in Soukup's favor when it was dismissed as a SLAPP. With respect to the remaining elements of her malicious prosecution claim—lack of probable cause and malice—we conclude that Soukup's evidentiary show-

ing is sufficient to demonstrate a probability of prevailing for purposes of the anti-SLAPP statute.

Soukup was named as a defendant in four causes of action in the underlying lawsuit; malicious prosecution, defamation, breach of fiduciary duty, and tortious interference with business relationships. To prevail on her malicious prosecution claim she is required to show only that defendants lacked probable cause for one of these causes of action. Soukup can show that Hafif lacked probable cause for his malicious prosecution claim in the underlying action because her evidence demonstrates that she did not initiate any of the lawsuits against him that were the basis of that claim; that she had minimal or no contact with any of her codefendants in the time period during which those actions were filed; and that Hafif, while maintaining that Soukup was "involved in the general work of implementing the attack on me" conceded at his deposition that he would not be producing any witnesses to testify that she assisted her codefendants in filing their complaints.[18]

Hafif's defamation cause of action was based on the Orange County Register article in which his former clients accused him of overcharging them for costs and fees. No allegations were made with respect to the second article involving the Department of Labor's investigation into LOHH's employee pension plan in which Soukup was quoted. Again, Soukup presented evidence that she had had minimal or no contact with Hafif's dissatisfied clients and Benson at the time the allegedly defamatory newspaper article appeared. No evidence was presented that she was the source of the information provided to the reporter who wrote the first article.

The breach of fiduciary duty cause of action was based on allegations that Soukup provided confidential information to Benson regarding certain cases on which she worked as a paralegal. Soukup presented uncontroverted evidence that her discussions with Benson about cases at LOHH occurred while both of them were employed at LOHH and, she therefore argues, were privileged under the qualified privilege for communications between interested parties. (Civ. Code, § 47, subd. (c); *Coastal Abstract Service v. First American Title* (1999) 173 F.3d 725, 735 ["California's common interest privilege, Cal. Civ. Code § 47(c), immunizes a person's statement to others on matters of common interest from liability in tort, provided that the person did not act with malice" (fn. omitted)]; *Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 285 [186 Cal.Rptr. 184] [communications between a

---

[18] Defendants assert that Hafif "withdrew" his malicious claim against Soukup, but fail to show where in the record that cause of action was dismissed against her.

company's employees may fall within the privilege].) Moreover, she also presented evidence that, to the extent he used this information in his wrongful termination actions against Hafif, it was without her knowledge or consent, and she denied having conspired with him to extort money or cases from Hafif. No evidence was presented that the qualified privilege did not apply to Soukup's communications with Benson during the course of their mutual employment at LOHH or that Soukup had disclosed confidential information to Benson after Benson had left LOHH in furtherance of the alleged conspiracy against Hafif.[19]

Hafif's cause of action for tortious interference with business relationships was premised on allegations that Soukup had conspired with other defendants to "devise[] a 'gameplan' [sic] wherein each sought to personally benefit by presenting a united front against plaintiffs to demand unjustified reductions in the fees and costs they owed plaintiffs for their legal services." Again, Soukup presented evidence that she had no or minimal contact with her codefendant in the timeframe during which the conspiracy was alleged to have been planned and carried out. She also pointed out that she would not have personally benefited from the alleged conspiracy, a point seemingly conceded by Hafif who, during a deposition, while insisting Soukup was part of the conspiracy, acknowledged he had no idea why she was involved in it.

As against this evidence tending to demonstrate lack of probable cause, defendants generally assert that probable cause existed to support their claims against Soukup without making a specific evidentiary showing as to each claim.[20] The general showing, moreover, consists primarily of rulings in other cases involving parties other than Soukup; for example, the denial of a summary adjudication motion brought by Terrie Hutton in the underlying

---

[19] Defendants cite a declaration from O.J. Freed, a mutual friend of Hafif and Benson's, in which he states that Benson said Soukup had told him that Hafif had accepted bribes "to sell out clients." Even accepting the declaration at face value, it fails to set forth the time, place and circumstances of this conversation between Benson and Soukup nor does it, on its face, support the specific causes of action alleged against Soukup by Hafif.

[20] In their briefs, defendants also repeatedly purport to incorporate by reference arguments from briefs they filed in the Court of Appeal and here in this case and in the *Hutton* case. They offer no authority that permits such incorporation and nothing in the California Rules of Court allows this practice. To the contrary, the relevant rule requires briefs filed in this court to conform to rule 14 which governs the content and form of briefs filed in the Court of Appeal. (Cal. Rules of Court, rule 28.1(a).) It is well settled that the Court of Appeal does not permit incorporation by reference of documents filed in the trial court. (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2 [130 Cal.Rptr.2d 347] ["it is not appropriate to incorporate by reference, into a brief, points and authorities contained in trial court papers, even if such papers are made a part of the appellate record"]; *Estate of Wiedemann* (1964) 228 Cal.App.2d 362, 370–371 [39 Cal.Rptr. 496] [incorporation by reference of points and authorities filed in the trial court violates Cal. Rules of Court, rule 14].) The same principle bars defendants' attempts to incorporate by reference arguments advanced in other appellate briefs. We therefore disregard these purported incorporations by reference.

action. But Hutton was not named in the cause of action for breach of fiduciary duty. Thus, even if the denial of her summary adjudication motion could be construed as a generalized finding of probable cause as to those counts in which both she and Soukup were named, Soukup could still prevail on her malicious prosecution claim based on the malicious prosecution of the cause of action for breach of fiduciary duty. (*Crowley v. Katleman, supra,* 8 Cal.4th at p. 695.) Defendants cite other rulings as disparate as the judgment in favor of Hafif and Stock in Terry Schielke's malicious prosecution action, and the order granting Stock's motion to strike Terrie Hutton's malicious prosecution action as a SLAPP. But defendants do not contend, much less demonstrate, that these rulings have collateral estoppel effect on the issue of whether probable cause existed to support the four causes of action in the underlying suit in which Soukup was named as a defendant. Absent such effect, they are irrelevant to that issue.[21] Equally irrelevant are the opinions of the Court of Appeal in this case as to which we have granted review, and are, therefore, no longer published or citable. (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1067, fn. 6 [48 Cal.Rptr.2d 1, 906 P.2d 1057]; Cal. Rules of Court, rule 976(d).)

Finally, defendants repeatedly argue that Terrie Hutton's diaries demonstrate that they had probable cause to proceed against Soukup in the underlying action. Preliminarily, defendants did not obtain these diaries until after they had filed the underlying action and, therefore, the diaries could not have provided them with probable cause for filing the action and naming Soukup as a defendant in it.[22] Even more crucially, in all the hundreds of pages of Hutton's diaries that appear in the appellate record, defendants fail to cite a single passage that specifically would lend support to their theory that Soukup actively conspired with any of her codefendants in the underlying action.

With respect to malice, Soukup argues that the fact the underlying action was dismissed as a SLAPP—that is, that it was brought primarily to chill the exercise of her constitutional rights of speech and petition—establishes a prima facie showing of malice because interference with the exercise of those rights is, by definition, an improper purpose to initiate and maintain litigation. We do not agree with the premise of Soukup's claim that an action eventually

---

[21] Accordingly we deny defendants' request to judicially notice the statement of decision in the *Schielke* case. (*People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 [14 Cal.Rptr.2d 377, 841 P.2d 897] [reviewing court need not take judicial notice of irrelevant court records].)

[22] Moreover, as the Court of Appeal concluded in the appeal affirming the dismissal of the underlying action as a SLAPP against Soukup and Hutton, those diaries were properly held to be *inadmissible.* Defendants make no showing that these diaries would be admissible against Soukup on any theory of admissibility. Therefore, no matter how often or insistently defendants attempt to rely on these diaries, the inescapable fact is that, as to Soukup, they are and remain inadmissible.

adjudicated to be a SLAPP was necessarily initiated and maintained with malice. However, Soukup also cites evidence of attitudes ranging from "open hostility to indifference" (*Grindle v. Lorbeer, supra,* 196 Cal.App.3d at p. 1465) that satisfies the requirement of a showing of minimal merit to her malicious prosecution claim so as to defeat defendants' motions. For example, she cites evidence that Hafif physically threatened her when she refused to accept unregistered stock as part of LOHH's distribution of its pension plan, the event she alleges ultimately resulted in her having been named as a defendant in the underlying action; that Stock told her Hafif had named her in the underlying action to prevent her from making trouble for him in the future; that Hafif admitted at a deposition he had no witnesses to testify to her involvement in the malicious prosecution cause of action in the underlying action; that Gregory Hafif threatened the lawyer Soukup retained to look into the pension plan matter with lawsuits and attorney fee claims; that Aitken failed to provide her with an explanation as to why she had been named a defendant in the underlying action and refused her request to be dismissed from the action; and that Stock refused to dismiss Hafif's appeal of the dismissal of the underlying action after she prevailed on her anti-SLAPP motion. Moreover, malice can also be inferred from the evidence that defendants lacked probable cause to initiate and maintain the underlying action against Soukup. (See *id.* at p. 1466.) We conclude that Soukup's showing is sufficient to establish malice for the limited purpose of defeating defendants' motions to strike.

Stock separately argues that Soukup cannot show a probability of prevailing on her malicious prosecution claim as to him because his role in the underlying action was limited to that of appellate counsel and there is no tort of malicious prosecution of an appeal. In the context of this case, we disagree.

In *Zamos v. Stroud* (2004) 32 Cal.4th 958 [12 Cal.Rptr.3d 54, 87 P.3d 802], we held that "an attorney may be held liable for continuing to prosecute a lawsuit discovered to lack probable cause." (*Id.* at p. 960.) Therefore, we concluded that the malicious prosecution plaintiff in *Zamos*, by demonstrating that the defendant attorneys continued to prosecute the underlying action after discovering it was without probable cause, had made a sufficient showing to defeat defendants' anti-SLAPP motion to dismiss. In so finding, we expressly distinguished *Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782 [226 Cal.Rptr. 90, 718 P.2d 77], on which Stock principally relies for the proposition that there is no malicious prosecution claim against an attorney who did not initiate the underlying action, but participated only in the appeal.

"In *Coleman*, the underlying action was commenced by the *plaintiffs* in the malicious prosecution action. Therefore, in order to establish their cause of

action against the defendant's insurer for malicious prosecution, the plaintiffs argued that the insurer, in maliciously causing the defendant to file a frivolous appeal, caused the initiation of a *separate action.* This is the argument the *Coleman* court rejected. [¶] . . . [¶] The operative distinction . . . is between continuing a prosecution and continuing a defense. In *Coleman,* the defendant in the malicious prosecution action had merely continued its defense of the underlying wrongful death action by causing the filing of the appeal in that action. Here, according to the evidence presented in opposition to the anti-SLAPP motion, defendants in the malicious prosecution action continued their prosecution of the underlying fraud action after learning it was baseless." (*Zamos v. Stroud, supra,* 32 Cal.4th at pp. 968–969, fn. omitted.)

The filing of an appeal is " 'the continuation of an action.' " (*Zamos v. Stroud, supra,* 32 Cal.4th at p. 969.) Under our reasoning in *Zamos,* therefore, the maintenance of an appeal by plaintiffs in an action discovered to lack probable cause may expose the plaintiff's attorney to liability for malicious prosecution. We therefore agree with Soukup that Stock cannot insulate himself from such liability, as a matter of law, simply because he asserts that his role in the underlying action was limited to that of appellate counsel. As we have observed in another context, the filing of such an appeal, which stays the litigation, may itself be a tactic that operates to the detriment of the defendant as to whom the action has been found to be a SLAPP. (See *Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th at p. 195.) Nor are we persuaded that the denial of Soukup's request for sanctions against Stock in the appeal of the underlying action demonstrates that the underlying action was supported by probable cause; that denial merely represented a finding that the argument advanced on appeal—that the trial court abused its discretion by entertaining Soukup's belated motion to strike—was not frivolous. (§ 907.)

Soukup also maintains that Stock's participation in the underlying action was greater than simply appearing as appellate counsel. The record appears to bear this out. For example, in the declaration Stock filed in support of his motion to strike Soukup's action, he states that he was involved in attempting to settle the action and personally communicated the settlement offer to her. In an earlier declaration he stated he made appearances on behalf of Hafif in the underlying action and assisted in the preparation of motions including preparing "a demurrer to [Soukup's] cross-complaint against Mr. Hafif." Soukup also presented evidence that Stock appeared in at least one deposition in the underlying action.

Based on the respective showings of the parties, we conclude that Soukup has shown a probability of prevailing on her malicious prosecution claim. Accordingly, on this ground we reverse the judgment of the Court of Appeal.

## III. JUDGMENT

We reverse the judgment of the Court of Appeal and remand the case for further proceedings consistent with our opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

The petition of appellants Law Offices of Herbert Hafif et al., for a rehearing was denied October 11, 2006.