Filed 10/30/14  Jackson v. Hoxie CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| REGINALD JACKSON et al., | |
| Plaintiffs and Appellants, | G050082 |
| v. | (Super. Ct. No. RIC1200563) |
| VALERIE JEAN HOXIE et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Riverside County, Daniel A. Ottolia, Judge.  Affirmed.

Law Offices of Fred J. Knez and Fred J. Knez for Plaintiffs and Appellants.

Chandler Law Firm, Robert C. Chandler and Carla R. Kralovic for Defendants and Respondents.

\*          \*          \*

In this case, we encounter a sad state of family affairs. Reginald Jackson (Reggie) and his wife Heidi Lorren-Jackson (Heidi) served Lizzie Jackson (Lizzie), Reggie's 78-year-old mother, with a 30-day notice to quit her dwelling.[1] Lizzie sought the help of her daughter, Valerie Jean Hoxie (Valerie). With the assistance of Valerie, Lizzie filed a lawsuit against Reggie and Heidi, in both their individual capacities and their capacities as trustees of the Jackson Living Trust of 1997, and also against her other son, Rex Jackson (Rex). Ultimately, Lizzie dismissed her lawsuit.

Reggie, Heidi and Rex thereafter filed the present lawsuit for malicious prosecution and abuse of process against Valerie and various lawyers who had assisted Lizzie and Valerie—Attorney Mary Ellen Daniels, Attorney Robert C. Chandler, Attorney Ronn S. Potter, and the law firm of Chandler, Potter & Associates. (Hereinafter, we refer to Valerie and the lawyers collectively as respondents.) Fortunately, they did not also sue Lizzie. The court granted the respondents' motions to strike and dismissed the malicious prosecution/abuse of process action. Reggie, Heidi and Rex (collectively, appellants) appeal.

Appellants contend the court erred, for a number of reasons, in granting the two motions to strike. They claim the court erred in its rulings on both Code of Civil Procedure section 425.16 and Civil Code section 1714.10, and in overruling certain evidentiary objections. We reject their various arguments and affirm.

I

FACTS

A. *Lizzie's Lawsuit:*

*(1) Initial Complaint—*

In May 2010, Lizzie, represented by Attorney Chandler, filed a complaint

---

[1] For ease of reference, we refer to the parties by their first names hereinafter. We mean no disrespect. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2.)

against appellants. She alleged, inter alia, that between 1992 and 2010 she had loaned about $26,000 to Reggie and about $59,000 to Rex.[2] In addition, she alleged that her residence on 35th Street in Riverside was sold in 1982 and the proceeds were used to purchase a home on Via Alberca in Riverside. Lizzie further asserted that, in 1992, the residence on Via Alberca was sold and the proceeds were used to purchase a home on Via Del Tecolote, also in Riverside. She explained that she provided the down payment for the purchase of the Via Del Tecolote property, loaning over $80,000, but that Reggie and Heidi took title to the property in their capacities as trustees of their trust. Lizzie maintained that she and respondents had a verbal agreement that she was entitled to live in the property for the remainder of her life.

Lizzie also asserted that, despite the agreement, in January 2010, Reggie removed her from her home at Via Del Tecolote against her will and placed her in a seniors' home. She nonetheless managed to return to the Via Del Tecolote property. In response, Reggie and Heidi served Lizzie with a 30-day notice to quit.

In her complaint, Lizzie asserted a number of causes of action, including but not limited to, constructive trust, conversion, breach of contract, breach of fiduciary duty, accounting, undue influence, misrepresentation, declaratory relief, elder abuse, and a request for injunctive relief. In addition to damages, she sought an injunction prohibiting Reggie and Heidi from evicting her from the Via Del Tecolote property.

*(2) Lis Pendens—*

On May 14, 2010, Attorney Chandler recorded a lis pendens against the Via Del Tecolote property, giving notice of Lizzie's lawsuit.

---

[2]     The copy of the initial complaint contained in the joint appendix bears a number of handwritten notations. The $59,000 figure has been lined out and replaced by a difficult-to-read figure that appears to be "$50k." (Underscoring omitted.) $50,000 is the figure contained in the first amended complaint.

3

*(3) Temporary Restraining order—*

On May 25, 2010, Attorney Chandler filed an ex parte application for a temporary restraining order, to enjoin appellants from evicting Lizzie from her home. The application stated that appellants had started moving Lizzie's furniture and furnishings to a storage facility and had stated they were going to move Lizzie out of the house by May 28. The application was supported by Lizzie's declaration.

In their joint declaration filed in opposition to the application, Reggie and Rex stated that Reggie and Heidi had purchased the property in question with their own funds and that Lizzie had been diagnosed with Alzheimer's disease in 2007. Reggie and Rex claimed Lizzie had agreed to spend a few days at an assisted living facility, where they placed her on January 2, 2010. However, Valerie picked her up and took her back home on the same day. Even after Lizzie and Valerie had been informed that the property was in the process of being sold, with an escrow scheduled to close on June 1, 2010, Lizzie did not move out. Rather, Valerie took Lizzie to Attorney Robert Chandler to make a claim with respect to the property.

At a hearing on May 27, the court granted the temporary restraining order.

*(4) First Amended Complaint—*

Lizzie and Valerie were deposed on July 28, 2010. Thereafter, on August 9, 2010, Lizzie filed a first amended complaint, in which she changed her factual allegations somewhat from the initial complaint. She maintained that the proceeds from the sale of her 35th Street property were used to purchase the property on Via Alberca. However, she no longer alleged that the Via Alberca property was sold in order to purchase the Via Del Tecolote property. Rather, Lizzie said that, in 1992, Reggie and Heidi decided they wanted to live in the Via Alberca property. So, they purchased the nearby Via Del Tecolote property "as a replacement residence for" Lizzie. Lizzie reiterated there was an agreement that she would be entitled to live in the Via Del Tecolote property until she died.

4

The first amended complaint continued to press the original causes of action including, but not limited to, constructive trust. It also included a new cause of action for quiet title based on Lizzie's claim of a life estate.

*(5) Dismissal—*

After conservatorship proceedings were instituted, as discussed immediately below, Attorney Chandler filed a request for dismissal of Lizzie's lawsuit without prejudice. Her lawsuit was dismissed on January 25, 2011.

*B. Conservatorship Proceedings and Related Resolution of Lizzie's Lawsuit:*

While Lizzie's lawsuit was pending, Valerie, on the one hand, and Reggie and Rex, on the other, filed competing petitions for conservatorship. A probate court hearing was held on June 2, 2010. A reporter's transcript of the hearing shows that the court considered a capacity declaration from Dr. Catherine Larson, Lizzie's primary care physician. The declaration indicated that Lizzie was highly functional, and stated she had the capacity to give informed consent and could continue to live in her home with close supervision. The transcript also shows that, at the hearing, Lizzie responded well to direct questioning by the judge.

The court declined to grant temporary conservatorship, based upon both a lack of emergency and a finding that Lizzie had the capacity to make informed consent. It set the two competing petitions for conservatorship for a contested hearing on July 13.

At the hearing, counsel for Reggie and Rex announced that they were withdrawing their petition. The court, observing that Valerie would not qualify as a conservator of Lizzie's estate without posting a bond, set an order to show cause why the public guardian should not be appointed conservator.

At an August 19, 2010 hearing on the matter, the court appointed the public guardian as temporary conservator of Lizzie's estate, and directed it to obtain another

5

capacity declaration, size up both Lizzie's estate and her lawsuit, and form an opinion as to whether Lizzie's lawsuit should be pursued.

According to Attorney Chandler, Attorney Stacy Keffer of the public guardian's office directed him to continue to handle Lizzie's lawsuit until the public guardian's office had a chance to become familiar with the case and interview Lizzie and others. Attorney Chandler said he worked closely with Attorney Keffer thereafter until January 25, 2011. In addition, he stated that from June 2010 through January 2011, he worked with Attorney Doreatha Miller, appointed counsel for Lizzie as proposed conservatee.

Attorney Chandler further stated that, on October 19, 2010, the public guardian's office filed an "objection" in Lizzie's lawsuit stating it would abide by the order of the court. Thereafter, neither the public guardian nor Attorney Chandler appeared at the December 2, 2010 hearing on Reggie and Heidi's motion to expunge Lizzie's lis pendens, and the court granted the motion. Attorney Chandler also said that, on January 25, 2011, Attorney Keffer directed him to file a request for dismissal of Lizzie's lawsuit, and he did so.

C. *Appellants' Lawsuit:*

(1) *Complaint—*

After Lizzie's lawsuit was dismissed, appellants filed the present lawsuit for malicious prosecution and abuse of process against respondents. In their complaint, appellants acknowledged that Lizzie had owned a home on 35th Street in Riverside. They said that Reggie and Rex had recommended she sell the property and buy another residence in a safer neighborhood, and that the two of them had helped Lizzie move from her 35th Street home.

Appellants alleged that Reggie and Rex bought the Via Alberca property in 1981 and that Lizzie moved into the residence with Reggie, Valerie, and Valerie's

6

daughter. They did not state what happened to Lizzie's money—the proceeds from the sale of the 35th Street property.

Appellants further alleged: "In December 1991 Reggie married his wife, Heidi. Before the marriage *they informed Lizzie that they* would like to live at the [Via] Alberca property and *would purchase another unit for her to live in*. Therefore, in February 1992, Reggie and Heidi purchased the [Via Del] Tecolote Property. Plaintiffs Reggie and Rex then assisted Lizzie in moving into the [Via Del] Tecolote Property." (Italics added.) Appellants emphasized that "Lizzie did not invest any of her money in the purchase of the [Via Del] Tecolote Property[,]" but they again omitted to say where the money from the sale of her 35th Street property went.

In addition, appellants indicated that Reggie and Rex had informed Lizzie in advance that they were going to sell the Via Del Tecolote property and move her to an assisted living facility. In April 2010, Reggie and Heidi entered into an agreement to sell the Via Del Tecolote, with escrow scheduled to close on June 1, 2010. Valerie was made aware of the sales agreement and of the intention of Reggie and Heidi to move Lizzie to an assisted living facility.

However, on May 13, 2010, Lizzie's initial complaint was filed. According to appellants, respondents caused Lizzie to file her lawsuit and also caused the recordation of a lis pendens against the Via Del Tecolote property. Appellants alleged that respondents knew the proceeds of the Via Alberca property could not possibly have been used to purchase the Via Del Tecolote property, as alleged in Lizzie's initial complaint, inasmuch as the Via Del Tecolote property was purchased in 1992, years before the Via Alberca property was sold. Appellants further asserted that respondents knew Lizzie had Alzheimer's and was not competent either to prosecute a lawsuit or to verify a complaint. They asserted causes of action for malicious prosecution and abuse of process.

7

*(2) Anti-SLAPP Motions and Ruling—*

Attorney Chandler, Attorney Potter, and their law firm, Chandler, Potter & Associates, filed a motion to strike (Attorney Chandler's Motion). Valerie and Attorney Daniels, attorney of record for Valerie in the conservatorship proceedings, also filed a motion to strike (Valerie's Motion). In each motion, it was asserted that the malicious prosecution and abuse of prosecution claims should be stricken under Code of Civil Procedure section 425.16 and also that the lawsuit constituted an effort to assert a conspiracy claim without complying with Civil Code section 1714.10.

In addition, the parties to Attorney Chandler's Motion argued, inter alia, that Lizzie was competent when she filed her initial complaint and first amended complaint, and that, in representing Lizzie, they relied on information she and Valerie had provided. In Valerie's Motion, Valerie and Attorney Daniels stated, inter alia, that inasmuch as they were neither parties to, nor counsel in, Lizzie's lawsuit, a malicious prosecution action against them would not lie and appellants could not demonstrate a probability of prevailing on their malicious prosecution action. Simply put, the lawsuit was instituted by Lizzie, not them. Moreover, they asserted that the fact the court granted Lizzie's request for a temporary restraining order to stop her eviction, denied the June 2, 2010 ex parte application for appointment of conservator, and ultimately appointed a conservator of the estate to oversee Lizzie's lawsuit, demonstrated that Lizzie's lawsuit was instituted with probable cause. Impliedly, had there been no probable cause, the court would not have made any of those orders.

At the hearing on the anti-SLAPP motions, the court stated that the malicious prosecution and abuse of process causes of action were each subject to Code of Civil Procedure section 425.16 and that it was granting the motions. When asked for clarification, the court specifically stated that it was ruling under Code of Civil Procedure section 425.16 and not making any ruling under Civil Code section 1714.10. In its formal order, the court stated it was granting the special motions to strike. It explained

8

that respondents had met their burden under the anti-SLAPP statute but that appellants had not. With respect to the malicious prosecution action, the court stated that appellants had not shown malice.

## II

## DISCUSSION

### A. Civil Code Section 1714.10:

Appellants' first argument is that the court should have denied the Civil Code section 1714.10 motions to strike.[3] Respondents retort that because the court did not rule on the section 1714.10 motions, there is no section 1714.10 ruling to challenge on appeal. We agree. Nothing more need be said.

### B. Code of Civil Procedure Section 425.16:

#### (1) Introduction—

Code of Civil Procedure section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." A motion under this provision is commonly known as an "anti-SLAPP" motion. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732-733.) We review the ruling on an anti-SLAPP motion de novo. (*G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 611.)

---

[3] Civil Code section 1714.10, subdivision (a) provides in part: "No cause of action against an attorney for a civil conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute, . . . shall be included in a complaint or other pleading unless the court enters an order allowing the pleading . . . to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. . . ."

9

"Resolution of an anti-SLAPP motion 'requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.)

"In 'making [that] determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b)(2); [citation].) The evidence submitted by the plaintiff[s] must be admissible [citation], and, if credited at trial, must support a judgment in [their] favor. [Citations.] Significantly, the trial court cannot and does not weigh the moving [defendants'] evidence against the opposing [plaintiffs'] evidence, but addresses the factual and legal issues as in a motion for summary judgment. [Citation.] If the opposing [plaintiffs] fail[] to make the requisite showing, the motion must be granted. [Citation.]" (*Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306, 318; *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1397.)

*(2) Malicious prosecution—*

*(a) First step – cause of action arising from protected activity*

It has been held that a malicious prosecution action "falls within the ambit of a 'cause of action against a person arising from any act . . . in furtherance of the person's right of petition' (§ 425.16, subd. (b)(1)), as statutorily defined." (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 734.) Put another way, "malicious

prosecution causes of action fall within the purview of the anti-SLAPP statute. [Citations.]" (*Id*. at p. 735.)

Thus, the respondents met their burden to show that the challenged cause of action arose from protected activity. (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.) Having met that burden, the burden then shifted to appellants to show a probability of prevailing on their malicious prosecution claim. (*Ibid.*)

*(b) Second step – probability of prevailing on claim*

*(i) required showing*

"We turn to the second step: whether [the plaintiffs] presented evidence sufficient to 'establish[ ] that there is a probability that [they] will prevail on the claim.' (§ 425.16, subd. (b)(1).)" (*Slaney v. Ranger Ins. Co.*, *supra*, 115 Cal.App.4th at p. 318.) In order to make that assessment, we must look at the elements of a malicious prosecution cause of action. "The three primary elements necessary to establish liability for the claim of malicious prosecution are that a prior claim initiated by [respondents in the matter before us] was: '(1) pursued to a legal termination favorable to [appellants in the matter before us] . . . ; (2) brought without probable cause; and (3) initiated with malice. [Citations.]' [Citation.]" (*Ibid.*)

*(ii) legal termination favorable to appellants*

Lizzie's prior claim was terminated upon dismissal of her lawsuit. Assuming, without deciding, that each of respondents is properly characterized as having initiated Lizzie's claim, respondents concede for the purposes of this prong of the analysis that the dismissal constituted a termination of the claim in favor of appellants.

*(iii) probable cause to file Lizzie's lawsuit*

We now look at the second element of the malicious prosecution claim— respondents purported lack of probable cause to file Lizzie's lawsuit. (*Slaney v. Ranger Ins. Co.*, *supra*, 115 Cal.App.4th at p. 318.) Appellants assert that they did indeed meet their burden on this second element. Appellants cite *Soukup v. Law Offices of Herbert*

11

*Hafif* (2006) 39 Cal.4th 260, 291, wherein the court stated: "To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" Appellants also emphasize that the *Soukup* court stated both that "the court does not *weigh* the credibility or comparative probative strength of competing evidence" and that "[t]he plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP. [Citations.]" (*Ibid.,* fn. omitted.) Appellants contend they did indeed provide sufficient evidence of their claim to establish "minimum merit."

But in order to show that their own claim had merit, appellants were required to demonstrate a probability of prevailing on their claim that respondents lacked probable cause to proceed with Lizzie's lawsuit. (See *Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at pp. 291-292.) This they did not do, for reasons we shall show.

*(A) allegations*

In their malicious prosecution cause of action, appellants asserted that respondents did not have probable cause to prosecute Lizzie's lawsuit because they knew the Via Del Tecolote property was not acquired with the proceeds of the sale of the Via Alberca property and because Lizzie, at her July 28, 2010 deposition, said the residence in which she was residing belonged to Rex and Reggie. They also said that respondents' conduct was both malicious and fraudulent, inasmuch as they knew Lizzie was not competent to prosecute a lawsuit or sign a verification, and, as evident from the July 28, 2010 deposition, Lizzie had no knowledge of the claims being asserted in her name. Appellants claimed respondents were using Lizzie for the ulterior motive of thwarting the efforts of Reggie and Heidi to sell their property and move Lizzie to an assisted living facility. They further alleged that after Lizzie's deposition, instead of dismissing the case, respondents filed a first amended complaint, including a claim for a life estate, as an additional ground to justify their lis pendens.

12

In their points and authorities in opposition to Attorney Chandler's anti-SLAPP motion, appellants again stated: "In December 1991, Reggie married his wife, Heidi. Before the marriage, *they informed Lizzie that they* would like to live at the [Via] Alberca Property and *would purchase another unit for her to live in*. Therefore, in February 1992, Reggie and Heidi purchased the [Via Del] Tecolote property." (Italics added.)

Appellants provided copies of the declarations of Reggie and Heidi in support of their October 5, 2010 motion to expunge. Reggie declared that he and Rex were the ones who bought the Via Alberca property. He further declared: "To the best of my recollection, *only a small portion of the proceeds of the sale of the 35th Street property were used to purchase the Via Alberca property (less than $8,000.00)*. My recollection is that LIZZIE used most of the proceeds from the sale of the 35th Street property to purchase new furniture for the new residence." (Italics added.) In addition, Reggie said that he and Heidi purchased the Via Del Tecolote property in 1992, without the use of any monies from Lizzie, and that the Via Alberca property was not sold until 1998. Reggie and Heidi each declared that he/she had never promised Lizzie that she could live in the Via Del Tecolote property for life.

In their points and authorities in opposition to each of the two anti-SLAPP motions, appellants asserted there was a complete lack of competent evidence to show Lizzie had an ownership interest in the Via Del Tecolote property. In particular, they emphasized respondents' failure to produce any evidence supporting the allegation of Lizzie's initial complaint to the effect that the Via Del Tecolote property was acquired with funds from the sale of the Via Alberca property.

Appellants acknowledged that Lizzie herself had signed a declaration in support of her ex parte application for a temporary restraining order to stop her eviction

13

from the Via Del Tecolote property.  In that declaration, Lizzie stated:  "The 5485 Via Del Tecolote property was acquired in about January, 1992 with the sales proceeds from the sale of my residence at 5427 Via Alberca, Riverside, California in 1992 and, initially, from the sale of my residence at 5444 35th Street, Riverside, California in 1982."

However, appellants discounted this declaration as being evidence.  They said no documentation was provided in support of Lizzie's declaration.  Moreover, they said no reasonable attorney would have believed the claim to be tenable because the Via Del Tecolote property was purchased years before the Via Alberca property was sold.  They attempted to discredit as self-serving Attorney Chandler's declaration that he believed what his client told him.  Furthermore, they chastised Attorney Chandler for failing to research title through the county recorder's office.

Appellants provided portions of the transcripts of the July 28, 2010 depositions of Valerie and Lizzie.  In her testimony, Valerie confirmed that the Via Del Tecolote property was purchased in 1992 and the Via Alberca property was sold in 1998.  Moreover, she stated that, to her knowledge, Lizzie did not make any contribution towards the purchase of the Via Del Tecolote property.

Lizzie, at one point in her deposition, said that the Via Del Tecolote property belonged to Rex and Reggie and commented, "I didn't buy that." At another point, when asked if she gave Reggie money to buy the Via Del Tecolote property, Lizzie said she did not remember.  Similarly, in one instance Lizzie said that she did not know if she had an agreement with Reggie and Heidi that she could live in the property until she died.

*(C) respondents' evidence*

Valerie and Attorney Chandler provided different portions of the same deposition transcript.  In the excerpt they provided, Lizzie testified that Reggie and Rex did tell her she could live in the Via Del Tecolote property until she died.  She also testified that she had loaned money to Reggie and Rex over the years.  In addition, Lizzie

14

testified that she owned her house on 35th Street free and clear when she sold it. While she no longer remembered how much she sold the house for, she knew that she "put [the money] into another place," which she identified as the Via Alberca property.

Attorney Chandler filed two declarations. He stated he had met with Lizzie and Valerie together, and then Lizzie alone, before preparing the initial complaint. He had no reservation about Lizzie's competency or understanding with respect to her goals, including her desire to file a lawsuit against Reggie and Rex "to stop the eviction," "sort-out her interest in the [Via Del] Tecolote property," and obtain "an accounting of the monies loaned to her sons" and her "investments placed with her sons." With respect to Lizzie's July 28, 2010 deposition, Attorney Chandler expressed his view that, overall, Lizzie "was lucid, understood the questions, and answered" concisely, even though she "became tired and frustrated" as the deposition wore on. He also stated that he met with Lizzie and Valerie again on August 3 and 9, 2010. Attorney Chandler said Lizzie "informed [him] clearly and unequivocally that her sons owed her a lot of money, that to date [had] not been repaid, and that her sons promised to allow her to live in the [Via Del] Tecolote property until she died." He said he "had no reservations about [Lizzie's] understanding about what she wanted to do" and that he "observed that she was lucid and articulate." Furthermore, he said her statements were corroborated by her diaries.

Valerie provided her own declaration in which she stated Lizzie used the sales proceeds from her 35th Street residence to loan money to Reggie and Rex to enable them to purchase the Via Alberca property and the Via Del Tecolote property, as well as Reggie's home in Redlands. Valerie continued on to state that Reggie and Rex had each told her on many occasions, including specifically January 7, 2010, that Lizzie would be allowed to live in the Via Del Tecolote property until she passed on. She also stated that both Reggie and Rex had acknowledged receipt of loans totaling over $150,000 beginning in 1992, to enable them to buy properties and start businesses.

15

Valerie also declared that she had been able to obtain some of Lizzie's financial records and diaries from a storage unit, but that Reggie and Rex had taken most of them. She attached copies of pages of what she represented to be Lizzie's diary. In some of those pages, Lizzie specifically admonished her sons and directed them not to take her property. On the cover of one diary was written: "Rex/Reg don't Take this Book!! Property mom!!" On one page was written: "[Brats]/Don't Take any more of my address Books Bank Stmt and Bring all my mail to me—and give me my [keys]—[I'm] tired of you two Boys. . . . What [ever] you want to know ask me and don't come over 2-3 times per wk [searching] [through] my goods. What the Hell are you try[ing] to do . . . ."

Although the diary was not a model of clarity, it contained notes regarding large sums of money loaned to Reggie and Rex either for down payments on homes or for business purposes. A December 2007 diary entry described a couple of five-figure loans and concluded: "Has never pd a penny . . . . I need my money. Where is my money? [¶] You two Boys terrible. [¶] special Reg[.]" The bank records also showed that Lizzie wrote numerous checks to Reggie, including several $1,000 checks dated in 1997 and 2003, and a $5,000 check dated in 1997.

Attorney Daniels provided a declaration in which she said that Lizzie was a relative of hers and that she was very close to both Lizzie and Valerie. Attorney Daniels declared she understood from information provided by both Lizzie and Valerie over the years that Lizzie had provided Reggie and Rex with more than $100,000 over time, to purchase real estate and start up businesses. It was her further understanding from conversations with both Lizzie and Valerie that Lizzie's money had been used to buy both the Via Alberca and the Via Del Tecolote property, and that Reggie and Rex had promised to allow Lizzie to live in the Via Del Tecolote property until she died.

Valerie and Attorney Chandler also provided a transcript of the August 19, 2010 hearing in the conservatorship matter. At that hearing, Lizzie's appointed counsel,

16

Attorney Miller, said: ". . . [Lizzie] does believe that she has a monetary interest in the real property in which . . . she resides right now, and she does believe that her sons owe her money. And that they have promised her that she could stay in that property . . . ." While appellants are correct that respondents could not have relied on the August 19, 2010 transcript in preparing the either the initial complaint or first amended complaint, Attorney Chandler declared that he was in close contact with Attorney Miller beginning in June 2010. Thus, he could have relied on information from Attorney Miller in preparing the first amended complaint. In any event, Attorney Miller's statement is evidence that, while Lizzie may have vacillated in her testimony during her deposition, outside of that context, she continued to maintain to her legal representatives that she had an interest in the Via Del Tecolote property and that she was promised that she could stay there.

*(D) analysis*

The question with respect to the second element of the malicious prosecution cause of action before us is whether there was probable cause to pursue Lizzie's lawsuit. The fact that Lizzie's lawsuit was ultimately dismissed is not determinative of the question, even assuming the dismissal was an indication that the lawsuit lacked merit. "'Probable cause may be present even where a suit lacks merit. Favorable termination of the suit often establishes lack of merit, yet the plaintiff in a malicious prosecution action must *separately* show lack of probable cause.'" (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 743, fn. 13.)

Appellants again cite *Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th 260, wherein the court stated: "'A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him.' [Citation.]" (*Id.* at p. 292.) As appellants readily point out, the focal point of their malicious prosecution cause of action was the allegation in Lizzie's initial complaint to

17

the effect that the Via Del Tecolote property was purchased with the proceeds of the Via Alberca property. They assert that respondents knew the allegation was false, and therefore lacked probable cause to file Lizzie's lawsuit.

However, Attorney Chandler declared that he met with Lizzie more than once and perceived that she was competent, lucid, articulate, and able "to explain the facts as she understood them" and to understand his comments to her. To expect Attorney Chandler to do a title search before filing the initial complaint would be to expect him to distrust the information he received from his client and to rack up legal fees for investigating his client's veracity. Moreover, even were we to agree that it would have been prudent for him to perform a title search before filing the lawsuit, and further assuming he had the time to do so under the circumstances, this does not mean that he knew the allegation in question to be false at the time he prepared and filed the initial complaint. Moreover, we have no information to indicate either that Lizzie and Valerie are lawyers or that they have a lawyer's ability to articulate pertinent facts and legal theories. The wording of the initial complaint may have been the result of nothing more than their loose wording in communicating with Attorney Chandler.

It is true that at her deposition, Valerie acknowledged that the Via Del Tecolote property was purchased before the Via Alberca property was sold. This an indication that she should have known the factual assertion that the Via Alberca property proceeds were used to purchase the Via Del Tecolote property was false, assuming she read the initial complaint. However, Valerie did not sign the verification of the complaint.

In any event, shortly after the depositions of Valerie and Lizzie, Attorney Chandler met with Lizzie and Valerie again. He prepared a first amended complaint to correct the apparently erroneous allegation and adjust the legal theories on which the lawsuit was based. According to Attorney Chandler, he reviewed the first amended

18

complaint with Lizzie and Valerie, and Lizzie adhered to her position that Reggie and Rex had promised she could remain in the Via Del Tecolote property until her demise.

Attorney Chandler's filing of a first amended complaint with corrections is in direct contrast to the case of *Sycamore Ridge Apartments LLC v. Naumann*, *supra*, 157 Cal.App.4th 1385, wherein the attorneys continued to pursue 18 causes of action for more than a year after a client's interrogatory responses showed that almost all of her causes of action were baseless. (*Id.* at pp. 1393-1394, 1402-1405.) As the *Sycamore Ridge* court observed, "[t]he tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.]" (*Id.* at p. 1402.) But here, shortly after the depositions at which the faultiness of the allegation became apparent, Attorney Chandler met again with his client, discussed the matter with her, and amended the complaint accordingly.

The long and the short of it is that Lizzie and Valerie both believed that, after Lizzie was displaced from her 35th Street residence, the proceeds from the sale of that residence were used to purchase the Via Alberca property. Indeed, in Reggie's declaration in support of the motion to expunge, he admitted that at least some of Lizzie's money was used towards the purchase of the Via Alberca property.

In any event, Reggie and Heidi decided to oust Lizzie from the Via Alberca residence too, because they wanted to live there. Indeed, in the texts of both their own complaint and their points and authorities in opposition to Attorney Chandler's Motion, appellants acknowledged that they told Lizzie they wanted to live in the Via Alberca residence and "would purchase another unit for her to live in," so they purchased the Via Del Tecolote property. This constitutes a judicial admission. (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271.) Of course, the statement is nonspecific as to the time period during which Reggie and Heidi contemplated that Lizzie would live in the Via Del Tecolote property. But it does, in any event, support the assertion that the Via Del Tecolote property was purchased as a replacement dwelling for

19

Lizzie when she was displaced from the Via Alberca residence, and that this was communicated to Lizzie.

True, at her deposition Lizzie stated, on the one hand, that Reggie and Rex promised her she could live in the Via Del Tecolote property for the rest of her life, and, on the other hand, that she did not remember if they told her that. However, Attorney Chandler and Attorney Miller each maintained that Lizzie held steadfast in telling them that Reggie and Rex had so promised. Moreover, Valerie declared that Reggie and Rex had made that commitment repeatedly in her presence.

All in all, there is sufficient evidence to support a claim that the money from Lizzie's 35th Street property was used to purchase, or at least to contribute to the purchase of, the Via Alberca property, and that Reggie and Heidi promised to purchase a replacement residence for Lizzie when they displaced her from the Via Alberca property. The fact that Lizzie's initial complaint may have been inartfully plead does not mean that her claim was unfounded.

Appellants heartily disagree. In addition to arguing that respondents had no reason to believe the facts they alleged, appellants also contend that respondents sought recovery based on an untenable legal theory. Appellants remind us that one who relies upon an untenable legal theory also lacks probable cause. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 292.) However, they barely make passing mention of respondents' legal theories in their opening brief, reserving their discussion of the constructive trust theory for their reply brief.

Appellants cite *Martin v. Kehl* (1983) 145 Cal.App.3d 228 as stating the elements of a cause of action for constructive trust, and argue that respondents have failed to provide any evidence in support of those elements. "'A constructive trust is a remedial device primarily created to prevent unjust enrichment; equity compels the restoration to another of property to which the holder thereof is not justly entitled . . . .' [Citations.]" (*Id.* at p. 237.) "'The essence of the constructive trust theory is to prevent

20

unjust enrichment and to prevent a person from taking advantage of his own wrongdoing.' [Citation.] In such a trust based upon wrongdoing, an oral promise is sufficient and the existence or absence of a confidential relationship between the parties, in the strict sense, is not controlling. [Citations.]" (*Ibid.*)

Civil Code "[s]ection 2224 provides that '[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, *or other wrongful act*, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.'" (*Martin v. Kehl*, *supra*, 145 Cal.App.3d at p. 237.) "In order to provide the necessary flexibility to apply an equitable doctrine to individual cases, these sections state general principles for a court's guidance rather than restrictive rules. [Citation.] Thus, it has been pointed out that 'a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.' [Citations.]" (*Id.* at pp. 237-238.)

Appellants contend respondents' "legal theory was to conjure up some claim of an ownership interest by Lizzie in the [Via Del] Tecolote property to prevent the sale of the property and [appellants'] removal of Lizzie from the . . . property to the assisted living facility . . . ." However, as we have said, appellants acknowledge that Lizzie sold her 35th Street property at the urging of Reggie and Rex. They further acknowledge that Lizzie thereafter lived in the Via Alberca property, which she believed she purchased, until she was again compelled to leave by her own children. Reggie at one point admitted that Lizzie paid at least a portion of the down payment of the Via Alberca property, although he would like to characterize the portion she paid as being small, without even discussing what the full amount of the down payment was. In their own pleadings, appellants acknowledge that Reggie and Heidi promised Lizzie that they would provide a replacement dwelling for her, since they were displacing her, yet again, from her home. Valerie is adamant that Reggie and Rex promised that Lizzie could live

21

in the Via Del Tecolote property for the remainder of her life, consistent with a promise to provide alternate housing to an ousted family member.

The legal thread here is not so slim as to be untenable. At the beginning of this story, Lizzie owned a home of her own. Having twice been displaced from her home at the instance of her family, she is told she is being displaced a third time and is to be left with no property of her own and no say in the matter. A claim of a right to live in a dwelling need not be made based exclusively on a grant deed. (Cf. *Martin v. Kehl*, *supra*, 145 Cal.App.3d at pp. 237-238.) "In determining whether the prior action was legally tenable, i.e., whether the action was supported by probable cause, the court is to construe the allegations of the underlying complaint liberally, in a light most favorable to the malicious prosecution defendant. [Citation.]" (*Sycamore Ridge Apartments LLC v. Naumann*, *supra*, 157 Cal.App.4th at p. 1402.) Taken in that light, we must conclude that the constructive trust cause of action respondents presented was legally tenable.

"'Reasonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* reasonable lawyers agree totally lack merit—that is, those which lack probable cause—are the least meritorious of all meritless suits. Only this subgroup of meritless suits present[s] no probable cause.' [Citations.]" (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 743, fn. 13.) Even considering that there was evidence supporting appellants' position, we certainly cannot say that all reasonable lawyers would agree that Lizzie's lawsuit was totally and completely devoid of merit.

### (iv) malice

When "the court determines that there was probable cause to institute the prior action, the malicious prosecution action fails, whether or not there is evidence that the prior suit was maliciously motivated. [Citations.]" (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875; accord, *Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31

22

Cal.4th at p. 742, fn. 11.) Inasmuch as we conclude that there was probable cause to file Lizzie's lawsuit, we need not address whether the trial court was correct in finding that appellants failed to meet their burden with respect to the third element of the malicious prosecution claim—malice. We nonetheless choose to address appellants' arguments on the point.

As appellants correctly observe, it is well established that "[t]he malice element of the malicious prosecution tort goes to the defendant's subjective intent in initiating the prior action. [Citation.]" (*Sycamore Ridge Apartments LLC v. Naumann*, *supra*, 157 Cal.App.4th at p. 1407.) "The malice required in an action for malicious prosecution is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted primarily for an improper purpose. [Citations.] It has been pointed out that the 'principal situations in which the civil proceedings are initiated for an improper purpose are those in which (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim.' [Citation.]" (*Albertson v. Raboff* (1956) 46 Cal.2d 375, 383, superseded by statute on another point; accord, *Sycamore Ridge Apartments LLC v. Naumann*, *supra*, 157 Cal.App.4th at p. 1407.)

Here, appellants claim that respondents, on the one hand, filed Lizzie's lawsuit for an improper purpose—to thwart Reggie and Heidi's sale of their Via Del Tecolote property and Reggie and Rex's placement of Lizzie in an assisted living facility. Appellants further assert that they themselves, on the other hand, acted with only the best of intentions. They say that they were only looking out for Lizzie's safety in deciding to move her to an assisted living facility when it was no longer safe for her to live alone,

and that Reggie and Heidi had every right to sell the Via Del Tecolote property, which they maintain was purchased with no contribution from Lizzie.

Yet in discussing the purported motivation of respondents, appellants provide no explanation for their assertion that Lizzie's lawsuit was just conjured up as a mechanism to scuttle Reggie and Heidi's sale—except to the extent they concede that respondents' intention was to assist Lizzie in her desire to remain in her home. And, as we have already said, respondents' method of asserting Lizzie's perceived right to stay in her home was based on probable cause. We cannot, therefore, agree with appellants that respondents filed Lizzie's lawsuit for an improper purpose.

On another point, appellants cite *Sheldon Appel Co. v. Albert & Oliker*, *supra*, 47 Cal.3d 863, wherein the court stated, "if the trial court determines that the prior action was not objectively tenable, the extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice." (*Id.* at p. 883.) Although we have determined that the prior action *was* objectively tenable, we have chosen nonetheless to address appellants' arguments pertaining to malice, including their contention that respondents' failure to check title records on the chronology of the property purchases is indicative of malice.

Appellants again say this case is similar to *Sycamore Ridge Apartments LLC v. Naumann*, *supra*, 157 Cal.App.4th 1385, wherein the evidence indicated that the plaintiff's attorneys acted with malice in continuing to pursue litigation on her behalf after her interrogatory responses demonstrated a total failure of support for most of the 18 causes of action in question. (*Id.* at p. 1408.) As the *Sycamore* court stated: "Once it became clear that there was no basis for a number of [the plaintiff's] claims, the defendants should have dismissed the claims immediately." (*Ibid.*)

In the matter before us, appellants emphasize that after the July 28, 2010 depositions had taken place, and it was shown that one of the factual allegations of the complaint was erroneous, respondents not only failed to dismiss the case, they also

24

refused to release the lis pendens. However, after those depositions, Attorney Chandler quickly met with his client to readdress the matter, and soon thereafter amended the complaint to delete the erroneous allegation and tailor the pleading accordingly. Just because he learned that the Via Alberca property did not serve as the source of funds for the Via Del Tecolote property, this did not mean, as we have already stated, that Lizzie had no conceivable claim.

In a similar vein, appellants argue that respondents' failure to provide any documentary evidence in support of Lizzie's lawsuit is indicative of malice. While respondents did not provide a paper trail to support the allegation that the proceeds of the Via Alberca property were used to purchase the Via Del Tecolote property, they withdrew the allegation about the source of funds to purchase the Via Del Tecolote property as soon as it was determined to be lacking in support. The inability to produce either an IOU signed by Reggie or Rex, or a written promise to let Lizzie live in the replacement property for the length of her life, is hardly evidence of malice. Family dealings are often unsupported by formal documentation, particularly in a situation where, as here, it is alleged that an elderly family member is being subjected to disadvantage. We have already addressed at length the evidence supporting a claim of constructive trust, and we need not repeat that discussion here.

Continuing on, appellants maintain that Valerie's deposition transcript provides "glaring" evidence of malice, given the conduct of Attorney Chandler and Attorney Daniels. Appellants cite one point in Valerie's deposition where Lizzie said: "I'm not part of whatever is going on." Attorney Daniels then said: "No, you don't have to be, so just sit back and take a chill. You can read the newspaper." Attorney Chandler then said: "You can read the newspaper. There you go."

Appellants construe this language as showing that Lizzie was declaring she had nothing to do with the lawsuit, and that Attorneys Daniels and Chandler were cutting her off. They imply that this shows Lizzie was against the pursuit of the lawsuit and that

respondents were pursuing it for their own purposes while taking advantage of Lizzie's dementia.

However, in support of their position, appellants provide only one page of the relevant portion of Valerie's deposition transcript. The first line of the page in question is Lizzie's remark, completely devoid of context. We do not know whether Lizzie meant to say simply that she was being left out of the exchange of questions and answers going on at the time, or whether she meant to say that, as appellants suggest, she objected to the pursuit of the lawsuit altogether. Without the benefit of context, we cannot get much meaning out of the exchange, including the comments of Attorneys Daniels and Chandler that Lizzie could occupy herself with the newspaper. It is appellants' burden to support their point with an adequate record for review. (*Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, 1362.)

Appellants also state the behavior of Attorneys Chandler and Daniels in responding in such a way to Lizzie when she had dementia, and thereafter having her execute the verification of a first amended complaint despite the deposition testimony of both Valerie and Lizzie, demonstrate that they were acting with malice. However, at the time of the depositions, no conservator had been appointed for Lizzie. In fact, the probate court judge had specifically declined to appoint a temporary conservator for Lizzie, given her able responses to his questions from the bench and Dr. Larson's capacity declaration. This being the case, Lizzie's lawyers had to do their best to represent her at her then current level of functioning, which Dr. Larson indicated was high.

Given the foregoing, we agree with the trial court that appellants failed to demonstrate a probability of prevailing on a showing of malice.

*(3)  Abuse of Process—*

*(a) Introduction*

"'Abuse of process is not just another name for malicious prosecution. Simply filing or maintaining a lawsuit for an improper purpose (such as might support a malicious prosecution cause of action) is not an abuse of process.  [Citation.]  [¶] Malicious prosecution and abuse of process are distinct.  The former concerns a meritless lawsuit (and all the damage it inflicted).  The latter concerns the misuse of the tools the law affords litigants once they are in a lawsuit (regardless of whether there was probable cause of commence that lawsuit in the first place).  Hence, abuse of process claims typically arise for improper or excessive attachments [citation] or improper use of discovery [citation].'  [Citation.]"  (*S.A. v. Maiden* (2014) 229 Cal.App.4th 27, 41-42 [__ Cal.Rptr.3d __], mod. 229 Cal.App.4th 497a, italics omitted.)

In their complaint, appellants alleged that respondents willfully caused Lizzie to execute the verification of her initial complaint when it contained a false allegation, and that they further willfully caused her to execute a verification of her first amended complaint when she did not have the capacity to prosecute the lawsuit, was not informed of the allegations, did not understand them, and did not believe in their truth.  Appellants alleged this was all done with the ulterior motive of blocking the sale of the Via Del Tecolote property and preventing appellants from moving Lizzie to an assisted living facility.

*(b) First step – cause of action arising from protected activity*

As we recall, the first step in the anti-SLAPP analysis is to determine "'whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.'"  (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.)  It has been held that "an abuse of process claim . . . involves protected activity under [Code of Civil Procedure] section 425.16.  Therefore, the first

27

anti-SLAPP prong is satisfied." (*S.A. v. Maiden*, *supra*, 229 Cal.App.4th at p. 42, mod. 229 Cal.App.4th 497a.)

*(c) Second step – probability of prevailing on claim*

*(i) required showing*

"'The common law tort of abuse of process arises when one uses the court's process for a purpose other than that for which the process was designed. [Citations.] It has been "interpreted broadly to encompass the entire range of 'procedures' incident to litigation." [Citation.] [¶] "[T]he essence of the tort [is] . . . misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating and injustice." [Citation.] To succeed in an action for abuse of process, a litigant must establish that the defendant (1) contemplated an ulterior motive in using the process, and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings.' [Citation.]" (*S.A. v. Maiden*, *supra*, 229 Cal.App.4th at p. 41, mod. 229 Cal.App.4th 497a.)

*(ii) ulterior motive*

We start by looking at the purported ulterior motive. As noted previously, appellants claim respondents were using Lizzie, who was suffering from dementia, for the ulterior motive of thwarting the efforts of Reggie and Heidi to sell their property and move Lizzie to an assisted living facility. However, there is no evidence that respondents had any motive to thwart the sale for their own benefits or because of some ill will towards Reggie and Heidi. Rather, the evidence shows respondents were acting only with the best interests of Lizzie in mind, in an effort to protect her rights to live in the home that was purchased for her when she was displaced from the Via Alberca residence. We have already discussed the evidence at length and will not rehash it here.

Appellants have not shown a probability of prevailing on a showing of ulterior motive. That being the case, we need not also address the second prong of the

28

abuse of process analysis, pertaining to willful acts.[4]

*C . Evidentiary Objections:*

Appellants assert that the trial court abused its discretion in ruling on their evidentiary objections raised in connection with their opposition to the motions to strike. More particularly, they say the court abused its discretion not only in the overruling of their objections, but also in "the manner" in which it ruled on their objections. (Capitalization omitted.) "Having failed to support [their] argument with citation to legal authority, it is waived. [Citations.]" (*Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 648-649.)

*D. Conclusion:*

Respondents met their burden to show that malicious prosecution and abuse of process causes of action may be subject to anti-SLAPP motions. The burden then shifted to appellants to show they had a probability of prevailing on their claims. Appellants were unable to demonstrate a probability of prevailing in establishing the second and third elements of a malicious prosecution claim—those pertaining to probable cause and malice. They were also unable to demonstrate a probability of prevailing in establishing the first element of an abuse of process claim—pertaining to ulterior motive. Therefore, appellants failed to meet their burden. The court did not err in granting the anti-SLAPP motions.

---

[4]       As an aside, we note that we also are not required to answer questions appellants pose to this court in the text of their discussion. (*Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1262-1264.)

## III

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.